ROWAN, Appellant, *v.* GAZETTE PRINTING CO. et al., Respondents.

(No. 5,743.)

(Submitted September 25, 1925. Decided October 10, 1925.)

[239 Pac. 1035.]

*Libel—Newspaper Article—Complaint—Insufficiency.*

Libel—When Publication Libelous *Per Se,* When not.
 1.  In order that words may be said to be "libelous *per se*" they must of themselves, without anything further, be opprobrious; where they are not so but require an allegation of facts by way of innuendo to show wherein they libeled plaintiff in order to state a cause of action, they are defamatory *per quod* and in such a case the complaint must allege special damages.

---

 1.  General rules applicable to libel and slander, see note in 4 **Am. Dec,** 348. See, also, 17 R. C. L. 391.

[74 Mont. 326.]

Same—What Renders Language Libelous *Per Se.*
2.  To render a publication libelous *per se,* the language used therein must be susceptible of but one meaning, and that an opprobrious one, and must on its face show that, taken as a whole, it refers to plaintiff, and not to him or some other person.

Same—Newspaper Article Held not Libelous *Per Se.*
3.  Under the above rules, *held* that the complaint in an action by a county attorney for libel based upon a newspaper article to the effect that he, after refusing to sign informations charging liquor violations or search-warrants against parties in a neighboring town prepared by an assistant attorney general, left his office for a considerable time and upon returning signified his willingness to act, but that when a raid was made nothing was found and that the officers declared they had been "double-crossed" by advance information of their coming, but not stating who did the "double-crossing," did not state a cause of action for libel *per se.*

Libel and Slander, 36 C. J., sec. 17, p. 1150, n. 74, n. 76, n. 76 New; p. 1151, n. 97; 37 C. J., sec. 358, p. 36, n. 26.

*Appeal from District Court, Carbon County; S. D. McKinnon, Judge.*

ACTION by C. C. Rowan against the Gazette Printing Company and another. Judgment of nonsuit and plaintiff appeals. Affirmed.

*Mr. John G. Skinner* and *Messrs. Shea & Wiggenhorn,* for Appellant, submitted a brief; *Mr. R. G. Wiggenhorn* argued the cause orally.

*Mr. Sterling M. Wood,* for Respondent Gazette Printing Company, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is an appeal from a judgment of nonsuit entered in an action for libel based upon an article published in the "Billings Gazette" on the fourth day of October, 1922.

3.  Words libelous *per se,* see notes in 1 Am. Dec. 4408; 12 Am. Dec. 39; 41 Am. Rep. 590; 116 Am. St. Rep. 802.

In the trial court, and here, plaintiff elected to "stand or fall" on his declaration that the article published is "libelous *per se.*" The only question for our determination, therefore, is: Does the published article contain a libel actionable *per se?*

The publication reads:

"Officers Stage Raid—Met With Open Arms.

"Assistant Attorney General Cotter and Party Motor to Red Lodge and Find Suspected 'Joints' Open and Ready to Stand Inspection.

"Contemplating a big raid and clean up of alleged bootlegging and vice conditions in the city of Red Lodge, state prohibition enforcement officers, headed by Assistant Attorney General Charles P. Cotter and the Rev. Joseph Pope of Billings, secretary of the Anti-Saloon League, swooped down on the Carbon county seat Monday evening and found nothing. The officers declare they were double-crossed.

"Pope Tells Story.

"The story of the raid and its failure is told by Mr. Pope and others of the party substantially as follows:

"Four agents of Attorney General Rankin's law enforcement department went into the Red Lodge community unbeknown to any of the county officials of that county and gathered evidence against eighteen 'joints' and information against twenty or more persons.

"Then Assistant Attorney General Cotter came to Billings a few days ago and began preparing this data and getting out warrants against the alleged violators. He was assisted in his work by Mr. Pope and county attorney E. E. Collins. When all was in readiness, Carbon county's prosecutor, Mr. Rowan, was summoned by Mr. Cotter to come to Billings 'on important business.' Mr. Rowan came. But when the informations and evidence were shown him and the plans of the raid were outlined to him, he seemed to be distinctly displeased, said Mr. Pope, and flatly refused to sign the war-

[74 Mont. 326.]

rants or informations, and told the Assistant Attorney General that he would resign as county attorney that afternoon. Mr. Rowan left the group, said Mr. Pope, and was gone for a considerable time. When he returned, he told Mr. Cotter that he was willing to go ahead with the search warrants, according to the Anti-Saloon League leader.

"So the party started from Billings Monday afternoon in automobiles. In the party were Mr. Cotter, Mr. Rowan, Mr. Pope, Mr. Collins, Deputy Sheriffs Bert Howard, George Mikels, Forrest Young, and Ed. O'Donnell, two Carbon county ministers, the Rev. A. C. Bear, of Fromberg, and the Rev. H. E. Chapple, of Bridger, and two agents of the law enforcement department.

"On reaching Red Lodge, according to members of the party, they found the suspected 'joints' thrown wide open, with safes and cabinets within also wide open, and the proprietors sitting on the curbs, awaiting them. The officers gleaned the information that one of the suspected men sprained his back in hurriedly moving a barrel of whisky, they said. A girl in a restaurant told Deputy Sheriff Mikels that a tip had come in the morning and that if the raiders had arrived earlier they would have made a big haul. A man named Smith was said to have told one of the officers that he received two tips, one in the morning and the other in the afternoon.

"It was learned when the party returned to Billings that the copies of the informations that had been signed by District Judge A. C. Spencer, had been left lying on a desk in county Attorney Collins' office, according to Mr. Collins and Mr. Pope. These papers legally should be on file in the district court of Carbon county, it was said."

In his complaint, after setting out the article in full, plaintiff employed more than 450 words by way of innuendo in an attempt to show wherein the publication charged that plaintiff was the person who "tipped off" the raid and thus

"double-crossed" the officers. He does not attempt to allege and prove special damages.

On the trial of the case, plaintiff detailed the circumstances surrounding his trip to Billings and what took place there. His recital did not differ materially from the statements made in the article, except that he showed that he was perfectly justified in his refusal to sign and swear to affidavits the contents of which were not within his knowledge; that when he "left the group" it was with the knowledge and at the suggestion of Mr. Cotter that he go to the Northern Hotel and put in a long-distance call for Mr. Rankin; that his statement that he would resign was in confidence made to Mr. Cotter and was coupled with the statement that he would resign rather than commit perjury; and that when he returned and agreed to participate in the raid it was because the affidavits, used as a basis for search-warrants, were signed by parties having knowledge of the facts therein set out. He showed his entire innocence of any wrongdoing in connection with the affair and his willingness to do his duty as an officer.

In argument, counsel for plaintiff conceded that the state-
[1]    ments made in the publication were substantially a recitation of what took place, but contended that the article contains implications and insinuations more damaging than actual charges. The error into which counsel seem to have fallen in drafting their pleadings, preparing their brief and in argument, is that they fail to observe the distinction made in the law of libel and running through all of the decisions of this court, between actions based on words which are declared to be actionable *per se* and those based on words which are not defamatory *per se,* but *per quod.* This distinction is clearly pointed out, and the former decisions of this court bearing on the subject are cited and commented upon by Chief Justice Callaway, in the recent case of *Manley* v. *Harer,* 73 Mont. 253, 235 Pac. 757. Further citation and discussion are unneces-

sary. Suffice it to say that the term *"per se"* means "by itself; simply as such; in its own nature without reference to its relations" (Standard Dictionary), and that, in connection with slander and libel, the term is applied to words which are actionable because they, of themselves, without anything more, are opprobrious. On the other hand, words which are defamatory *"per quod"* are those which require an allegation of facts, aside from the words contained in the article, by way of innuendo, to show wherein the words used libel the plaintiff, in order to state a cause of action in a complaint, and in such a case the complaint must also allege special damages.

Again,. in order to render a publication actionable *per se,* [2] the language used therein must be susceptible of but one meaning, and that an opprobrious one, and must on its face show that the derogatory statements, taken as a whole, refer to the plaintiff, and not to him or some other person.

Reading the article in the light of the foregoing rules and [3] of the evidence adduced on the trial, if the plaintiff has been libeled, it is only by the use of the term "double-crossed." "The officers declare that they were double-crossed." Undoubtedly they were, but by whom? Can we say, from a reading of the whole article, without anything else before us, that it charges that Rowan, and no other person, betrayed his associates in the raid? To ask the question is to answer it. The publication does no more than to point the finger of suspicion to someone who had advance knowledge of the purpose of the officers and corruptly used such knowledge; the suspicion attaches as well to Judge Spencer, to Cotter, Pope, Collins or any of the others who took part in the raid. The "tip" may have come from some outsider who either saw the papers "left lying on a desk in County Attorney Collins' office," or from someone who merely deduced, from noting the personnel of the party and the direction taken by the automobiles, that a raid was to be staged at Red Lodge.

The lengthy innuendo found in the complaint indicates that the pleader considered it necessary to point out in what manner the article charged the plaintiff with "double-crossing" his brother officers; and such innuendo was necessary in order to charge a libel on the publication, if plaintiff could allege facts sufficient to constitute a cause of action for libel herein. But, if libelous at all, the words used were libelous, not *per se*, but *per quod*.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, GALEN and STARK concur.