WOOLSTON, RESPONDENT, *v.* THE MONTANA FREE PRESS ET AL., APPELLANTS.

(No. 6,763.)

(Submitted May 11, 1931. Decided September 14, 1931.)

[2 Pac. (2d) 1020.]

*Mr. William I. Lippincott, Mr. Sydney Sanner* and *Mr. Fred J. Furman,* for Appellants, submitted an original brief and reply briefs; *Mr. Sanner* and *Mr. Furman* argued the cause orally.

304

*Mr. John K. Claxton, Mr. P. E. Geagan* and *Mr. A. C. Mc-Daniel,* for Respondent, submitted an original and a supplemental brief; *Mr. Geagan* argued the cause orally.

HONORABLE HENRY G. RODGERS, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified, delivered the opinion of the court.

This action is for libel. Defendants, The Montana Free Press and W. A. Clark, Jr., filed separate demurrers to the complaint upon the ground, among others, that the complaint does not state a cause of action. The demurrers were over-

ruled, separate answers were filed, issues were joined, and a trial resulted in a verdict and judgment for plaintiff. Motion for new trial was denied, and defendants bring the cause here for review. The defendant Harry Gerard was not served and did not appear.

The article upon which this suit is based was published in the Montana Free Press on the front page, and reads as follows:

"Petty Move Against the Free Press. Anaconda Practice Shown in Activities Aimed at Business Operation of Independent Newspaper. The Anaconda Copper Mining Company's politics, business as well as political, embodies underground and picayune policies, and they remind one of E. Watters Neek, when a copper company newspaper employs a man in its business department whose sole duty apparently is to travel about Butte, Billings and Missoula and devote his time to attempts to injure The Montana Free Press. B. E. Woolston, a former executive of this paper, resigned when his demand for a higher salary was not met and was employed by the Butte Post.

"The Post is owned and operated by the Anaconda Copper Mining Company. The big boss of the company in Butte—or perhaps the brilliant idea emanated from some company politician or agent—ordered the employment of Woolston in the peculiar capacity he exercises. In the past record of the copper company some very small and contemptible deals may be found. But this is the petty limit, and serves to show how far the great organization will go to vent its ill will against an independent newspaper.

"Woolston, it was said, was employed in the Post's business department. However, the day he went into the Post, four of the business employes there offered their resignations, according to credible report, and only reconsidered their action upon being assured that the new employe would have no connection with or authority over them. Then it was said that he was to have charge of foreign advertising.

"He went to Billings, and there began attacks on The Free Press by urging its employes to quit and by threatening to

destroy The Free Press business. Whether he was under direct orders from the Sixth Floor is unknown.

"One singular episode concerned the mailing list of the Billings Free Press, an effort to secure which was made in an unethical and underhand manner, and the surrounding circumstances seemed to warrant the conclusion that the Post's foreign advertising man was behind the effort.

"To an employe of The Free Press at Billings he said: 'You may tell Harry Gerard [Mr. W. A. Clark, Jr.'s representative] that after next week he will need only one advertising salesman at Billings, and that in 90 days he won't need any.' This vain threat was made in the presence of two other employes of the paper. Presumably Woolston's job was to wipe out The Billings Free Press in three months—a course, no doubt, that would have been highly satisfactory to the Sixth Floor.

"The Billings Free Press has a competent solicitor. The new Butte Post plenipotentiary extraordinary sought him out, offered him a job on the Billings Gazette at $50 a week, $3 a day expenses and the use of a car if he would desert The Free Press. Asked by the solicitor what warranty he would have of a permanent position, Woolston offered to deposit the sum of $1,000 to indemnify him. Then he told the solicitor that The Free Press circulation manager at Butte intended to discharge him, anyway, and would have done so while Woolston was on The Free Press had he not prevented it. The man partly fell for Woolston's talk. However, when the circulation manager learned of this peculiar episode in the acquirement of foreign advertisement by Woolston, he interviewed the solicitor and the latter remained in his employment with The Free Press.

"The Butte Post and the Anaconda Copper Company managers and head men must have felt great gratification at these services of Woolston. But they are merely isolated instances in a general campaign waged against The Free Press, in which the paper was threatened with loss of circulation, and was attacked from various quarters, while its men were ap-

proached with offers of new jobs with the copper company's newspapers if they would quit The Free Press, and assurances that The Free Press would be very short lived, particularly since the Butte Post's new business employe had got on its trail.

"To one executive of The Free Press he made dark hints of how he could hurt the paper's circulation, and declared that it would soon know it had opposition. To another he got as far as to say, 'If you want to make a change'—when he was informed that The Free Press man was satisfied with his employment.

"He also made strenuous efforts to have Free Press national advertisements canceled. He had about as much effect on The Free Press as a flea would have on an elephant. But the Anaconda Copper Mining Company should be proud of itself. By urging him in connection with its kept paper, the Butte Post, it has shown that a great corporation, to vent its spite and malice, may stoop to anything.

"At the latest accounts the company's new foreign advertising man was still pursuing the methods described, going strong, and apparently backed by the company's newspaper head, the Sixth Floor Manager of the company's local affairs."

It is contended by defendants that the article is not a libel *per se,* and plaintiff in his brief states: "It will be conceded by the respondent that if the article published of and concerning the respondent is not a libel *per se,* then the complaint does not state a cause of action."

The term *"per se"* means "by itself; simply as such; in its own nature without reference to its relations." (Standard Dictionary.) It is well-settled law that the words used in the alleged libelous article must be susceptible of but one meaning to constitute libel *per se,* and that the libelous matter may not be segregated from other parts and construed alone. (*Paxton* v. *Woodward,* 31 Mont. 195, 107 Am. St. Rep. 416, 3 Ann. Cas. 546, 78 Pac. 215; *Brown* v. *Independent Pub. Co.,* 48 Mont. 374, 138 Pac. 258; *Shaffroth* v. *The Tribune,* 61 Mont. 14, 201 Pac. 271.)

The entire printed statements must be viewed by the court as a stranger might look at it, without the aid of special knowledge possessed by the parties concerned. (*Brown* v. *Independent Pub. Co.*, supra; *Shaffroth* v. *The Tribune*, supra; *Denney* v. *Northwestern Credit Assn.*, 55 Wash. 331, 25 L. R. A. (n. s.) 1021, 104 Pac. 769.)

Using the foregoing rules in interpreting the writing in ██ question, we are forced to the conclusion that the acts and conduct ascribed to plaintiff therein are not libel *per se,* and the characterization of them by the writer as the "petty limit" or as being a "peculiar episode" or as a "singular episode" does not make the charges more serious; even if we were to consider the fifth paragraph specifically (which counsel have not done) the case for plaintiff is no better. It is therein stated that "an effort was made in an unethical and underhand manner to secure the mailing list of the Billings Free Press, and the surrounding circumstances seemed to warrant the conclusion that the Post's foreign advertising man was behind the effort." A reading of the entire article conveys the definite information that by the designation "the Post's advertising man" is meant the plaintiff, and it is the law that to assert a suspicion, belief, or opinion is as effectively a libel as though the charge were positively made. The plaintiff is not accused of having made the effort, but the meaning of the language is that some person or persons made the effort, and that the plaintiff was behind the move. In what manner or how the effort or attempt was made, or rather what the conduct of the person or persons was in attempting to secure the mailing list is left to conjecture, as well as the extent of the responsibility of the plaintiff for the effort in the form in which it was made. The effort, whatever its nature, did not succeed, according to a fair interpretation of the article. Both "unethical" and "underhand" are words of such broad meaning that they may or may not carry a libelous meaning. The fifth paragraph, if a libel at all, requires an innuendo to show that it is such, and, when an innuendo is required, the language used is not a libel *per se.* (*Manley* v. *Harer,* 73 Mont. 253, 235 Pac. 757.)

We fail to see, in the absence of innuendo or explanation, how the language used can be held to be of that nature that it is "injurious to the plaintiff in his business or profession," or exposes him "to hatred, contempt, ridicule, obloquy," or causes "him to be shunned or avoided."

The judgment is reversed, and the cause remanded to the district court, with direction to set aside the judgment and the order overruling the demurrers, and sustain the demurrers of defendants to the complaint.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES FORD, ANGSTMAN and MATTHEWS concur.

Rehearing denied September 29, 1931.