KELLER, Respondent, *v.* SAFEWAY STORES, INC., et al., Appellants.

(No. 8,063.)

(Submitted May 28, 1940. Decided September 23, 1940.)

[108 Pac. (2d) 605.]

*Messrs. Alf C. Kremer, H. D. Carmichael* and *Rex F. Hermingsen,* for Appellants, submitted an original and a supplemental brief; *Mr. Kremer* argued the cause orally.

*Messrs. Lewis Brown, J. F. Emigh* and *W. D. Murray,* for Respondent, submitted a brief; *Mr. Emigh* argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This action was brought to recover damages for alleged slander. Plaintiff charges in her complaint that on January 29, 1935, the defendant Safeway Stores, acting through its agent in the course and scope of his employment, did falsely in the

presence and hearing of Mrs. Annie Bawden, plaintiff's mother, utter of and concerning plaintiff the following unprivileged words: "She [speaking of plaintiff] cashed a check at the Safeway Store and ordered a sack of flour sent to an address where there was no house and received change for the check. The check was no good and if you [referring to Mrs. Annie Bawden] don't have her [speaking of plaintiff] come down and see me, we will have the sheriff after her."

The trial of the cause resulted in a $10,000 verdict for plaintiff, and defendants have appealed from that judgment. This cause was formerly before the federal district court where a general demurrer was sustained to the complaint. (*Keller* v. *Safeway Stores, Inc.,* (D. C.) 15 Fed. Supp. 716.)

There are three main questions for decision: (1) Does the language constitute slander *per se*? (2) Was it uttered by an agent of the Safeway Store acting within the course and scope of his employment? (3) Are the damages excessive?

Slander, among other things, is a false and unprivileged publication other than libel which: "1. Charges any person with crime." (Sec. 5691, Rev. Codes.)

"A crime or public offense is an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, any of the following punishments: (1) Death; (2) Imprisonment; (3) Fine; (4) Removal from office; or, (5) Disqualification to hold and enjoy any office of honor, trust, or profit in this state." (Sec. 10721, Rev. Codes.)

Did the language alleged to have been spoken charge plaintiff with crime? If it did, then it was slanderous *per se*. To determine this question resort must be had to the following well-established rules of law in libel and slander cases:

(1) In determining whether false defamatory words said to have been spoken of and concerning the party complaining are or are not slanderous *per se,* the opprobrious words are to be construed according to their usual, popular and natural meaning and common acceptation, that is, in the sense in which persons out of court and of ordinary intelligence would understand them, for the presumption is to be indulged that the third

party or parties present so understood them. (*Daniel* v. *Moncure*, 58 Mont. 193, 190 Pac. 983; *Burr* v. *Winnett Times Pub. Co.*, 80 Mont. 70, 258 Pac. 242; *Porak* v. *Sweitzer's, Inc.*, 87 Mont. 331, 287 Pac. 633; *Campbell* v. *Post Publishing Co.*, 94 Mont. 12, 20 Pac. (2d) 1063.)

(2) The statement made must be viewed by the court as a stranger might look at it, without the aid of special knowledge possessed by the parties concerned. (*Campbell* v. *Post Pub. Co.*, supra; *Woolston* v. *Montana Free Press*, 90 Mont. 299, 2 Pac. (2d) 1020.)

(3) The language used must be susceptible of but one meaning and that an opprobrious one. (*Campbell* v. *Post Pub. Co.*, supra; *Burr* v. *Winnett Pub. Co.*, supra, *Manley* v. *Harer*, 73 Mont. 253, 235 Pac. 757; *Brown* v. *Independent Pub. Co.*, 48 Mont. 374, 138 Pac. 258.)

(4) The alleged defamatory matter is to be construed as an entirety and with reference to the remaining portions of the conversation. (*Brown* v. *Independent Pub. Co.*, supra; *Rowan* v. *Gazette Printing Co.*, 74 Mont. 326, 239 Pac. 1035; *Woolston* v. *Montana Free Press*, supra; *Cooper* v. *Romney*, 49 Mont. 119, 141 Pac. 289, Ann. Cas. 1916A, 596; *Shaffroth* v. *The Tribune*, 61 Mont. 14, 201 Pac. 271.)

(5) If the language is not slanderous *per se*, it cannot be made so by innuendo (*Daniel* v. *Moncure*, supra; *Brown* v. *Independent Pub. Co.*, supra), because the term *"per se"* means by itself; simply as such; in its own nature without reference to its relations. (*Woolston* v. *Montana Free Press*, supra.) As otherwise stated in *Manley* v. *Harer*, supra: "Words are defamatory *per se* which upon their face and without the aid of extrinsic proof are injurious to the person concerning whom they are spoken. If the injurious character of the words does not appear from their face when taken in their plain and natural meaning and according to the sense in which they appear to have been used, they are not defamatory *per se* but are said to require innuendo."

Tested by the foregoing rules, of what did the alleged words charge plaintiff? We must point to some statutory provi-

sion which defines as a crime the acts and conduct attributed to have been committed by plaintiff in the alleged slanderous statement. In doing this, it must be borne in mind that it is not necessary to constitute a libel or slander that the language used should charge the commission of a crime with the technical accuracy of an information or indictment. (36 C. J., p. 1202; 16 Cal. Jur. 50.) "A defamatory charge does not have to be made in direct, positive language, but impliedly it may be made so plainly that it can have only one meaning and may constitute libel *per se.*" (*Burr* v. *Winnett Times Pub. Co.,* supra.) Odgers on Libel and Slander, sixth edition, page 117, states the matter thus: "Where spoken words are sought to be made actionable, as charging the plaintiff with the commission of a crime, we have seen that a criminal offense must be specifically imputed. It will not be sufficient to prove words which only amount to an accusation of fraudulent, dishonest, vicious or immoral, but not criminal, conduct. Still it is not necessary that the alleged crime should be stated with all the technicality or precision of an indictment; it is enough if the crime be imputed in the ordinary language usually employed to denote it in *lay conversation.* Again, if criminal conduct be distinctly imputed, it is not necessary to specify the kind of crime imputed. All that is requisite is that the bystanders should clearly understand that the plaintiff is charged with the commission of a crime. 'The meaning of the words is to be gathered from the vulgar import, and not from any technical legal sense.' "

Here the plain and natural meaning apparent from the face of the words spoken states of the plaintiff: That she obtained a sack of flour from the Safeway Store by means of a no good check; that she received change for the check; that she ordered the flour sent to an address where there was no house; and, if she did not come down and see the manager of the store about the matter, they would have the sheriff after her.

Looking at these statements as a stranger and giving to the words used their natural, usual and popular meaning and common acceptation, the clear imputation charged is unequivo-

cally conveyed to our minds, that this plaintiff obtained money through the pretense of a no good check. The statement that the flour was ordered delivered to an address at which there was no house suggests that plaintiff resorted to such artifice to further her plan of obtaining the change for the check.

Section 11411, Revised Codes, makes it a crime to obtain ▮▮ money or property by means or use of a false or worthless check. It provides: "Every person who obtains or attempts to obtain from another any money or property, by means or use of brace faro, or any false or worthless checks, or by any other means, artifice, device, instrument or pretense, commonly called confidence games or bunco, is punishable by imprisonment in the state prison not exceeding ten years." The statement having charged plaintiff of doing just that, we fail to see how it can seriously be contended that she was not charged with crime. It follows that the language used constituted slander *per se.* (See *Juretich* v. *People*, 223 Ill. 484, 79 N. E. 181.)

Section 11411, supra, apparently was not considered by the federal court in determining this cause, but it did hold in its decision that knowledge and intent were both essential to the commission of the crime of obtaining money or property by false pretenses under section 11410, Revised Codes, and that from the statement made a third party would not necessarily have concluded that plaintiff had been guilty of false pretenses within the meaning of section 11410. Argument to the same effect is advanced by counsel with respect to section 11411, the statute on which the jury was instructed. Granting that knowledge and intent are essential elements of the crime, and that the state in a prosecution under the false pretense statute, and under the confidence game statute, would probably have to charge intent and knowledge to make out a sufficient information, still we fail to see where that requirement has any application to an alleged slanderous statement charging one with crime. We believe the fallacy of such a view is most aptly demonstrated by the case of *Carl* v. *McDougal*, 43 Cal. App. 279, 184 Pac. 885, 886. In that case the alleged slanderous statement was: "Mr. Carl is a forger. He has forged my name to a check, and I

have a lithographed copy of the check in my office." The court in its decision said: "In criminal prosecutions for forgery, the intent to defraud is not only an essential element of the crime of forgery, but it is an essential element to every indictment for forgery. (*People* v. *Turner*, 113 Cal. 278, 45 Pac. 331; *People* v. *Smith*, 103 Cal. 563, 37 Pac. 516.) In reliance upon this strict rule of criminal pleading, the appellant contends the complaint in the present case was fatally defective, in that it contained no allegation that the slanderous words were used with the intention of charging that the plaintiff had forged the indorsement intending thereby to defraud. If the words were slanderous, the intention with which they were used is immaterial, except, possibly, upon the question of exemplary damages. The rule relied upon by the appellant binds him. The charge of forgery necessarily includes all the elements of the crime. If the defendant accused the plaintiff of forgery or said the plaintiff had forged a check, he accused the plaintiff of a felony. It is not necessary that the language used should be chosen with the technical nicety required in an indictment. (*Mitchell* v. *Sharon* (C. C.) 51 Fed. 424, 425.) Under the contention of the appellant none but those trained to observe the technicalities of criminal procedure would be able to slander their neighbors, and they would know how to limit their statements so they might do the wrong and avoid its consequences. Where one accuses another of having forged his name to a check, the language can mean nothing other than that the person accused has been guilty of a felony."

We think the same principle applies to statements imputing the obtaining of money or property by means of false or worthless checks, or by means of false pretenses.

Beyond question it is the rule that the principal is liable for wrongs committed by the agent while acting within the scope of his employment. (*Fowlie* v. *Cruse*, 52 Mont. 222, 157 Pac. 958; secs. 7965, 7966, Rev. Codes.) The rule finds expression in the following language in *Harrington* v. *H. D. Lee Mercantile Co.*, 97 Mont. 40, 59, 33 Pac. (2d) 553, 558: "When the application of *respondeat superior* is presented, 'the decisive

question in every instance is whether the agent or employee was, at the time of negligent injury, acting within the scope of his employment. If he acted independently of his employer, or was upon missions or purposes of his own, then the employer is not to be held accountable in damages.' ''

Here it is admitted by the answers of defendants that Alvin Cobb was the manager of a Safeway Store on the date of the slander. Denial of the fact that he was acting within the course and scope of his employment presents that question for immediate consideration. In some cases this inquiry presents a question of law for the court to decide, and in others the circumstances of the case may make it one for the jury. Mechem on Agency, in volume 2, section 1982, states: ''The question of whether the act was one within the course of the employment, is usually a question of fact, in view of what the employment was and what can fairly be deemed to be within its course under the circumstances of the case. Where only one legal inference may reasonably be drawn from the facts, the court should decide it; but where differing legal inferences may reasonably be drawn, it is a question for the jury.''

The court in *Gomez* v. *Great Atlantic & Pacific Tea Co.*, 48 Ga. App. 398, 172 S. E. 750, 752, stated: ''Except in plain and palpable cases, it is for the jury to decide the question whether the servant was acting within the scope of and in furtherance of his employment when he committed the tortious act in question.''

And according to the Restatement of the Law of Agency, section 229: '' (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) Whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (f) whether or not the master has reason to expect that such an act will be done; and (i) the extent of

departure from the normal method of accomplishing an authorized result."

An extensive search of the authorities has drawn us to the conclusion that the maze of decisions on the subject is the result of a large variety of differing factual situations which in most cases are determinative of the question of whether the agent is acting within the scope of his employment. While the courts are quite harmoniously in accord in their statements of the general rules applicable, their applications of those rules has brought about such a diversity of opinions as to make a uniform standard of measurement somewhat difficult to apply. However, from the more recent decisions throughout the various jurisdictions and from text-writers, we understand it to be the law generally that the wrongs for which liability may attach to the principal not only include negligent acts, but malicious, wanton and wilful acts as well. (2 Mechem on Agency, secs. 1957 et seq., p. 1520; 2 Am. Jur., sec. 361, p. 280; *Son* v. *Hartford Ice Cream Co.*, 102 Conn. 696, 129 Atl. 778; *Gomez* v. *Great Atlantic & Pacific Tea Co.*, supra.)

The fact that an agent in acting for his principal may deviate from express instructions or even act in utter disobedience thereof does not generally relieve the principal of liability if the acts were in furtherance of or incidental to the employment for which the agent was expressly or impliedly engaged. (Restatement of the Law of Agency, sec. 230, p. 514, and *Son* v. *Hartford Ice Cream Co.*, supra.) The particular matter in hand is oftentimes so closely related to the express purpose of an agent's employment, that when so acting he is acting within the scope of his employment. Further, it has been held that the fact that an agent combines some of his personal business with that of his principal's does not relieve the principal unless it clearly appear that the agent could not have been directly or indirectly serving his master. (Restatement of the Law of Agency, sec. 236, p. 529; *Broecker* v. *Moxley*, 136 Cal. App. 248, 28 Pac. (2d) 409; *Kirk* v. *Montana Transfer Co.*, 56 Mont. 292, 184 Pac. 987.)

It can be said that in most cases the delegation of authority to agents does not include expressly or impliedly the commission of negligent or malicious and wilful acts; however, if such acts occur in furtherance of or are incidental to the discharge of the master's business, not a "frolic of the agent's own," nor an act animated purely by personal motives or desires, the master can be and has been held, although not in all cases, responsible for such acts. The following cases and those above cited are illustrative: *Wells* v. *Robinson Bros. Motor Co.,* 153 Miss. 451, 121 So. 141; *High Co.* v. *Holler,* 42 Ga. App. 657, 157 S. E. 209; *Gerstein* v. *C. F. Adams Co.,* 169 Wis. 504, 173 N. W. 209; *Kastrup* v. *Yellow Cab & Baggage Co.,* 129 Kan. 398, 282 Pac. 742; *Houston* v. *Oppenheim,* 166 Miss. 619, 145 So. 339; *Western Union Tel. Co.* v. *Hill,* 25 Ala. App. 540, 150 So. 709; *Atlanta Hub Co.* v. *Jones,* 47 Ga. App. 778, 171 S. E. 470; *Moffit* v. *White Sewing Mach. Co.,* 214 Mich. 496, 183 N. W. 198; *John* v. *Lococo,* 256 Ky. 607, 76 S. W. (2d) 897; *Priest* v. *F. W. Woolworth Five & Ten Cent Store,* 228 Mo. App. 23, 62 S. W. (2d) 926; *Great Atlantic & Pacific Tea Co.* v. *Smalley,* 26 Ala. App. 176, 156 So. 639; *Smothers* v. *Welch & Co. House Furnishing Co.,* 310 Mo. 144, 274 S. W. 678, 40 A. L. R. 1209; *Russell-Lock Super-Service Co.* v. *Vaughn,* 170 Okl. 377, 40 Pac. (2d) 1090.

Montana adheres to the rule as stated. In the *Kirk Case,* supra, the agent was employed to move furniture and to collect for the moving of it. Either in moving a refrigerator against the will of the owner or in attempting to seize the refrigerator as security for the bill for moving other goods, and while plaintiff physically resisted the taking of the refrigerator, the agent threw it against plaintiff injuring her. In affirming a judgment for plaintiff against the agent's principal, the court said first that whether the agent was acting within the scope of his authority was a question for the jury, and, second: "In *Grorud* v. *Lossl,* 48 Mont. 274, 136 Pac. 1069, Mr. Chief Justice Brantly stated: 'By the great weight of authority it is also the rule that when an agent of a corporation in the course of the discharge of duties intrusted to him by it, and within the apparent

scope of his authority, does an act from which a third person suffers injury, the corporation also is liable for the damages flowing therefrom, even though the agent may have failed in his duty to the principal, or may have disobeyed his instruction.' (See, also, 2 C. J. 948.) Further: 'The tort of an agent is within the course of his employment where the agent, in performing it, is endeavoring to promote the principal's business.' (2 C. J. 853, and cases cited: *Smith* v. *Munch,* 65 Minn. 256, 68 N. W. 19; *Gibson* v. *Dupree,* supra [56 Colo. App. 324, 144 Pac. 1133].) The company employed Van to move the goods and collect therefor. That in doing one or both of these duties he committed the assault has been determined by the verdict of the jury.''

The record discloses the following facts: Mr. Cobb announced to plaintiff's mother on his visit in quest of plaintiff that he was the manager of the Safeway Store on Granite and Main; that he wanted plaintiff to come down to the store to straighten out the address to which the flour was to be sent, and that he wanted her to make good on a no good check. The record also shows that Cobb, as manager, took personal checks on his own account; that instructions to store managers from superiors in the organization were to the effect that ''anyone taking a personal check would do so at their own responsibility.'' The statement was also in evidence that a supervisor over Cobb had told him not to accept personal checks unless the customer giving the check were known.

From these few observations it is obvious that some conflict existed as to the exact purpose of the manager's visit at the home of plaintiff's mother, that is, straighten out the address, or to obtain payment to make good the no good check. Also, the testimony offered by defendants with relation to the store practice of taking checks from customers was not so clear as not to leave some room for reasonable doubt as to the exact rule governing the matter.

The record admits of some conflict as to whether the taking of checks by store managers was an authorized practice in the Safeway Store system. From the defendants' testimony it

is clear that such practice was not prohibited, but on the contrary the imputation is that checks could be received, subject, under defendant's theory, to the condition that managers were personally liable for any bad checks so received. In other words, the substance of the store practice in receiving checks under defendants' version is, that a store manager could accept any and all checks; if they were good and cleared through the banks, everything was regular and so far as Safeway Stores were concerned their business was promoted through the act of their agent in selling merchandise in exchange for a check accepted by him; if the checks turned out to be bad, then the accepting manager became personally liable on the check because of his misguided judgment in accepting such check—in either event the store's business was promoted, and whether good or bad, Safeway Stores stood to lose not one cent. At best, under these circumstances, the question whether the manager in accepting a bad check did so on behalf of the store was one for the jury to decide. But even if we assume that he was not the agent acting within the express scope of his employment while attempting to collect the check, we still have a question for the jury whether the slander grew out of acts incidental to the employment.

The jury might have believed that the visit to the home of plaintiff's mother was so closely intermingled with the employment Cobb was expressly authorized to do, and that the ensuing slander was a wrong committed, if not in furtherance of his employment, at least as an incident thereto—either would be sufficient to bind the company. The authority delegated to Cobb did not expressly include the making of defamatory statements, but if their making was incidental to his employment, then the principal was liable. (*Houston* v. *Oppenheim,* supra.) The wrong here—the slander—taken at its face value, can reasonably be said to have been an intended means by which Cobb expected to obtain payment on the no good check. Clearly, had he been attempting to get payment on behalf of the store and in so doing uttered the slanderous words, the store would have been liable. (See *Moffit* v. *White Sewing Mach. Co.,* supra; *Atlantic Hub*

*Co.* v. *Jones,* supra; *Russell-Lock Super-Service* v. *Vaughn,* supra; *Son* v. *Hartford Ice Cream Co.,* supra.)

Are the damages excessive? It is the rule in this jurisdiction ▮▮▮▮▮ that slanderous words defamatory *per se* carry the presumption of falsity and damages are recoverable without allegation or proof of special damages. (*Manley* v. *Harer,* supra; *Campbell* v. *Post Pub. Co.,* supra, and cases therein cited.) It is equally well settled that the amount to be awarded is peculiarly within the discretion of the jury after taking into consideration all the circumstances appearing from the evidence. (*Downs* v. *Cassidy,* 47 Mont. 471, 133 Pac. 106, Ann. Cas. 1915B, 1155; *Paxton* v. *Woodward,* 31 Mont. 195, 78 Pac. 215, 107 Am. St. Rep. 416, 3 Ann. Cas. 546.)

"There is no fixed measure of damages applicable to actions for defamation. The verdict is open to inspection and revision by the court for the purpose of determining whether the jury was guided by a sound discretion in fixing the damages. Unless the damages are so unconscionable as to impress the court with its injustice and thereby induce the court to believe that the jury was actuated by passion, prejudice or partiality, it rarely interferes with the verdict. The question of the excessiveness of the verdict is primarily addressed to the discretion of the trial court." (37 C. J., sec. 590, p. 128.)

In *Downs* v. *Cassidy,* supra, this court in a slander case announced: "The court ought not to interfere unless the sum awarded is so large as to raise a presumption that the amount fixed was due to some gross error on the part of the jury, arising out of a misconception of the case or the result of undue motives. (Newell on Slander and Libel, 848.) Furthermore the discretion of the trial court in granting or refusing a new trial on the ground urged here is moved by several considerations which this court cannot take into account. Among these is a personal view by the trial judge of the parties and their witnesses. His action must therefore be accepted as final, unless, after making due allowance for the superior position he occupies toward the case, this court is compelled to the conclusion that he has been guilty of an abuse of discretion."

From our study of the record, we have concluded that such a ▉ case of abuse is presented. Here there is no testimony as to special damages. This court has a better opportunity to judge of the award than in the ordinary case, like the *Downs Case*, supra. The only testimony bearing on the question of actual damages was the statement of plaintiff to the effect that the charge of passing the no good check made her sick, and scared to go any place; that she was ashamed to visit anybody "with them thinking accusingly of her that she had passed a no good check." This showing, plus the legal presumption of damages that arises from the utterance of words constituting slander *per se*, justifies the assessment of a reasonable sum as actual damages, but we fail to see that this showing called for or justified the extraordinary and highly burdensome recovery of $10,000.

Objection was made to the introduction of testimony relating to certain conversation and matters occurring at the Safeway Store the day following the slander at the home of plaintiff's mother. The ground of the objection was chiefly that such matters were beyond the issues in the case and without bearing upon the slander alleged in the first cause of action, for the reason that the district court had sustained defendants' demurrer to plaintiff's second cause of action which was based on the alleged incident. Specifically, the testimony was as follows:

"Q. And what transpired there? (Objection.) A. We went in there [Safeway Store] and Mr. Cobb wasn't in. Mr. O'Brien told us to wait, he would be right back at 2 o'clock. It was around one o'clock then.

"Q. What happened when Mr. Cobb was there? (Objection.) A. Well, he showed us a check and he said we better go over to the district attorney's office so we went over, my husband and I.

"Q. Did he say anything about a check at that time, or in your presence to anyone there? (Objection.) A. Well, he just showed the check and said we would go over to the district attorney's office."

We are aware of the general rule to the effect that ''other ▮ publications by defendant against the same person are not admissible in evidence for the purpose of proving the publication of the defamation upon which the action is based.'' (37 C. J., sec. 469, p. 73.) Counsel for appellants also cite us to the general rule in 75 C. J., section 416, page 55, which states: ''As in other actions, the issues in actions for defamation are confined to such matters as are sufficiently raised by the pleadings, * * * . Again in application of the general rule, the evidence admissible is confined to that which relates to matters within the issues as raised by the pleadings.''

Counsel contend that the above testimony was prejudicial to defendants for the reason that ''there was no mention made of any action to be taken by the district attorney's office, and to have allowed the jury to obtain even the impression that a criminal charge was to be made against the plaintiff was highly prejudicial.'' Also, that such testimony must have caused the jury to think that some criminal prosecution against the plaintiff grew out of the transaction—all to the prejudice of defendants.

We think the seriousness of the effect of this testimony is more apparent than real. Proof of the slander had already been made, so there could be no objection to the statements on the basis of the first general rule just set forth. In that proof also was the testimony of the threat of sending the sheriff after plaintiff if she did not come down to the store to straighten out the matter of the check. To the lay jury, that statement alone was sufficient to impress upon their minds the possibility of criminal prosecution, and consequently the subsequent mention of the district attorney's office was merely testimony of the same general import and with like effect upon the jury. This condition of the record, plus the additional fact that counsel for defendants in the cross-examination of one of plaintiff's witnesses again brought out the name of the sheriff's office in connection with plaintiff's case, seems to us to have rendered harmless any error that might otherwise have resulted from the admission of the evidence.

The verdict as returned inherently speaks the result of passion and prejudice, misconception or mistake. While plaintiff was entitled to some amount as general presumptive damages, taking into consideration her mental distress and embarrassment among friends, we are unable to see how the jury could have allowed her the sum of $10,000 as a reasonable amount under the facts of this case, if it acted impartially and free from prejudice. We do not feel disposed or justified in transcending the province of the jury by herewith ordering a reduction of the verdict. However, it should be remembered that the slander was published but to one person and that person plaintiff's mother. Upon a new trial this fact should be considered by the trial judge in determining whether or not any verdict returned is or is not excessive.

It is therefore ordered that the judgment be and is reversed and the cause remanded to the district court for a new trial.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ARNOLD concur.

### ON MOTION FOR REHEARING.

(Filed December 3, 1940.)

MR. JUSTICE ERICKSON delivered the opinion of the court.

In the petition for rehearing upon the part of the respondent, ▉ strenuous objection is made to the action of this court in sending the matter back for a new trial, rather than finally disposing of it by reducing the award. In its answer to the petition for rehearing and in its objections, the appellant joins with the respondent in praying that this court make the reduction so as to end this litigation.

The sole testimony as to damage sustained by the respondent is as follows:

"Q. And what effect did this statement [Cobb's] have upon you? A. Well, it made me sick; I was sick over it. I went that night over to McMahon's and got my clothes and told her about it and told her I didn't know what it was all about, and I was real scared to go any place.

"Q. And how did it make you feel when you met your friends? A. Well, I just was ashamed to visit anybody, with them thinking I passed a check, a no good check; they all look at you in accusing me of things."

As stated in the original opinion, the slander was not repeated to anyone except the respondent's mother by appellant through its employee.

In the opinion in chief we indicated **our** unwillingness to attempt to indicate what the proper award should have been, or to state the dividing point at which we would consider an award would enter the realm where its allowance would have shocked the conscience of the court, and this for the reason that such action on our part would constitute a usurpation of the province of the jury and of the trial court.

The meagerness of the testimony in this case greatly increases the force and effect, in the determination of the amount of the award, of the appearance of the witnesses—particularly the plaintiff—on the witness stand. This court did not have the opportunity of observing the witnesses personally, and since the amount of the award in a slander case depends so greatly upon the effect of the slander on the plaintiff, the record before us affords no reasonable basis on which this court may assume to state the damage.

We appreciate the desirability of ending this litigation, and it should not be necessary to point out to counsel that since they are both willing to have us here fix the amount of the award, they should have no difficulty in effecting a just compromise and end the litigation by their own action.

Each party will pay his own costs on this appeal.

The petition for rehearing is denied.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS and ARNOLD concur.

MR. JUSTICE ANGSTMAN, Dissenting:

On motion for rehearing I have given further consideration to the question of the size of the verdict. I agree that it is large,

46

but I have come to the conclusion, upon further study, that it is not so shockingly large as to indicate passion and prejudice on the part of the jury. If we impute passion and prejudice on the part of the jury, we must make the same accusation against Judge Lynch who approved the verdict by denying the motion for a new trial.

Here it has been established that defendant falsely accused plaintiff of the commission of a crime. That crime was a felony, carrying a maximum penalty of ten years in the state penitentiary. We have often stated that we will be slow to interfere with the judgment of the trial court on the question of excessiveness of the verdict. (*Staff* v. *Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042; *Autio* v. *Miller*, 92 Mont. 150, 11 Pac. (2d) 1039; *Fulton* v. *Chouteau County Farmers' Co.*, 98 Mont. 48, 37 Pac. (2d) 1025.) I think we should not interfere with his judgment here or with that of the jury even though had we been jurors we might not have been willing to agree to a verdict in that amount. There are cases sustaining $10,000 verdicts in slander or libel cases where the charge was no more opprobrious than that here. (*Pfister* v. *Milwaukee Free Press Co.*, 139 Wis. 627, 121 N. W. 938; *Estelle* v. *Daily News Pub. Co.*, 101 Neb. 610, 164 N. W. 558.) And a verdict for $5,000 for injured feelings alone has been sustained. (*Cyrowski* v. *Polish-American Co.*, 196 Mich. 648, 163 N. W. 58.)

The amount of compensation for the mental suffering endured by plaintiff was peculiarly within the province of the jury. There is no exact standard by which to measure in money the amount that will compensate for mental anguish. If the amount "is a matter of guesswork, the jury can guess as well as we." (*Autio* v. *Miller*, supra.) The accusation made against plaintiff might cause grievous mental suffering to one person and only slight mental disturbance to another under the same circumstances, depending upon the sensitiveness of the person against whom the charge is made. Jurors must understand that they have a conscientious duty to perform in fixing the amount of damages awarded to a litigant in a tort action. They must not be led to believe that the matter of fixing damages is un-

important—that if they make the award too small the supreme court will increase it to what it should be, and if they make it too large the supreme court will pare it down to what it ought to be. The more we interfere with their verdicts, the more apt are they to conclude that what they do on that question is merely a matter of form. The record here fails to show any extrinsic matters which might have created passion or prejudice on the part of the jury as was the case in *Wise* v. *Stagg,* 94 Mont. 321, 22 Pac. (2d) 308, and in *Tanner* v. *Smith,* 97 Mont. 229, 33 Pac. (2d) 547, which we pointed out in *Fulton* v. *Chouteau County Farmers' Co.,* 98 Mont. 48, 37 Pac. (2d) 1025, as the reason for disturbing the verdicts in those cases. I think the statement made by Lord Camden in *Huckle* v. *Money,* 2 Wils., (K. B.) 207, 95 Eng. Rep., Reprint, 768, is correct wherein he said: "It is very dangerous for the judges to intermeddle in damages for torts; it must be a glaring case indeed of outrageous damages in tort, and which all mankind at first blush must think so, to induce a court to grant a new trial for excessive damages."

What we said in *Wallace* v. *Wallace,* 85 Mont. 492, 279 Pac. 374, 382, 66 A. L. R. 587, is here applicable. This court in that case said: "A new trial on the ground of the excessiveness of the verdict can be granted only when the verdict is so excessive as to evidence passion and prejudice on the part of the jury. (Sec. 9397, Rev. Codes 1921.) If we should reverse the judgment and remand the cause for a new trial on this ground alone, we would, in effect, substitute our judgment for that of the jurors and instruct a subsequent jury that it should render a verdict for a less amount, and how should we determine what would be a reasonable amount under the circumstances? We might reduce the verdict, but on what facts found in the record could we say: So much would be reasonable, so much excessive? How are we to gauge the loss or suffering of the plaintiff for the loss of the affection and companionship of a wealthy and pleasure-loving husband and the assistance of a father in the case of an ailing child? These matters are best left solely to the sound judgment of the jury, and such a judgment

should be set aside only when it is manifest that the verdict was rendered under the impetus of passion and prejudice. Here we cannot say that such a showing was made.''

I am persuaded that though the verdict is large, since it has received the sanction of the trial judge who had the advantage of seeing the witnesses, and since there are no extrinsic facts in evidence calculated to show passion or prejudice, we ought not to interfere with it and that the judgment entered thereon should be affirmed.