Caroline K. Simon, J.
Claimants sue for negligence on the part of the State of New York in the construction, alteration and reconstruction of Grand Central Parkway, and more particularly that portion of it which includes the Main Street overpass, from which negligence they allege $7,175 in damages occurred to claimants ’ residence at 144-08 Grand Central Parkway, Jamaica, New York, during the period from June, 1962 up to and including December of that year. Claimants allege that the walls, foundations, supports, furniture and furnishings were damaged, broken and destroyed in connection with the widening of Grand Central Parkway including the Main Street overpass, when the same was negligently, carelessly and improperly affected by the use of excessive amounts of explosives, overloaded and huge pile drivers, overloaded and huge vehicles, all without proper support or proper shoring of the claimants’ *125 premises, and all without proper or any precaution to prevent damage to claimants’ premises and further that the State’s agents, servants or employees and contractors were insufficiently and inadequately skilled and schooled in the progress of the widening and demolition work then being performed at or near claimants’ premises.
Notice of intention to file the claim was duly filed with the Clerk of the Court of Claims on December 31, 1962 and in the office of the Attorney-General on January 2, 1963.
The claim itself was timely filed in both offices on January 6, 1964, and has neither been assigned nor submitted to any other court or tribunal for hearing or determination.
The claimants, a married couple, together owned the property, having taken possession on April 17, 1961. Thereafter, they testified to having done considerable work on the house, which had been built in 1941, before moving into it as their home on May 29, 1961.
Mr. Horn stated that the repair work done by them included painting the brick and stucco house inside and outside, replacing the heating plant, laying new flooring in the kitchen and basement, and in general modernizing the house. He testified that the house was in good condition with no violations at closing of title, nor when they moved into it, and that there were no cracks inside or out when they took possession.
The house is Tudor, two-story, with slate roof, attic and full basement, and occupies 25 feet by 32 feet of a 43 feet by 100 feet plot located on the south side of the Grand Central Parkway service road, 100 feet from Main Street. There are a separate two-car garage, also of brick with a slate roof, and an 8 feet by 10 feet front porch. Curb and sidewalk are at the front of the 15 feet wide lawn.
Mr. Horn testified that a three-lane service road between 30 and 35 feet in width faced the front of his property and that the ground sloped downward toward a depressed section of Grand Central Parkway, then a two-lane road in each direction. He stated that in the early Spring of 1962 all the trees near the road were cut down, and, thereafter the parkway was blocked off to traffic, and in mid-June the service road was broken up by the use of concrete breakers, and then steel pilings measuring 50 to 60 feet in height were driven into the ground, spaced from Main Street to Daniels Street.
Mr. Horn testified that this operation was accompanied by blasting, loud pounding noises and vibrations which shook everything in the house and made it impossible to speak or hear on the telephone. Early in July, after the concrete breakers had *126 performed their function, he testified that a steam-operated pile driver drove the beams into the ground at 10-foot intervals along the service road and along the second road. Wooden boards were placed along the beams to permit extra equipment to install foundation walls. He described the pile driver sound as having a metallic ring and echo and its vibration as causing loud sounds as it met resistance in the form of rocks or boulders.
Mr. Horn stated that his windows were broken and that so many cracks, numbered in the hundreds, appeared in various portions of his home during July and August that he found it impossible to enumerate them. He also reported that the construction trucks would use his 14-foot driveway to back up and turn around to cart away the material excavated by steam shovels. On September 25, 1962, Mr. Horn wrote a letter to the contractors advising of the damage and charging them with responsibility therefor.
In March of 1963, he requested a professional engineer to inspect his property. The engineer prepared an itemized listing of damage to each part of the house and this listing was included in claimants’ bill of particulars. The types of damage listed included roof tiles dislodged, baseboards separated from walls, porch separated from house, bricks loosened from house and garage, lawn damage, water leakage in laundry, and windows broken.
Claimants’ expert, a construction engineer experienced in the use of road-building machinery and blasting procedures, prepared an itemized report on the conditions he found, and the estimated cost to cure. He testified that the damage was a direct-result of the use of an excessively large concrete breaker and a pile driver within 20 feet of claimants’ house, and denied the State’s contention that cracks appearing in the walls of the rooms were attributable either to humidity, temperature changes or settlement of the house on its foundation, stating that these cracks were horizontal, and not vertical, that settlement cracks would normally appear within a few months of the completion of construction, and that these cracks were observed by him to be new and made within months of his inspection.
The engineer further testified that vibration and blast damage of the type he found coidd have been avoided by the use of test borings of the soil, and examination of the cores thus unearthed. He stated that this procedure constituted good engineering practice, and that a contractor should be required to drive a test boring and secure a seismographic result which can then be the basis on which to determine methods and techniques best suited to the soil samples of the terrain encountered. *127 He described various methods of moderating and modulating the effects complained of, among them being the adjustment of the impact force of the driver, placing planking beneath the driver, driving the piling at different angles or in alternate sequence, breaking up the charges of dynamite into smaller amounts, deepening of the charge holes, and the use of shaped charges when near structures.
Mrs. Horn testified that when she first noticed the cracks she visited the construction shack located diagonally across the parkway but could find nobody in charge with whom to register her complaints. She stated she had made from 10 to 15 such visits, and that the only result came in 1963 when someone came to her door to ascertain the name of the owner of the house and then left without inspecting the damage.
A witness employed as a field engineer by the firm in charge of design and technical inspection of construction of the parkway testified that his records indicated that blasting occurred adjacent to the Horn property on September 24, 25, 26 and 27, 1962.
A State employee in charge of all road and bridge contracts in Queens testified in an examination before trial that his duties as area supervisor required him to visit the active contracts and his jurisdiction included the adjustment, if possible, of any difficulties which might arise. He stated that he was in charge of over-all inspection and supervision of the use of explosives in the area, with a staff of employees assigned to various areas under him, and that it was part of his job to receive any complaints that might arise. As to the amounts of explosives used, he testified that this was the province of the Fire Department, which maintained an inspector on the job for this purpose, although he admitted that it was his responsibility to make certain that no more than a 40% powder charge (nitroglycerine content) was used, in order to conform with the New York City ordinance regulating such powder strength, and that he accepted the report of the Fire Department representative as to this conformity.
The blasting inspector for the Fire Department submitted records indicating the number of sticks of dynamite used daily in the immediate vicinity of the Horn residence during May, June, September and October of 1962. The amounts varied from 18 to 90 sticks per day. His records also contained requests by other contractors working in other areas of the project for the use of delayed blasting caps (termed M. S. caps) so as to minimize vibration, although no such requests were recorded as having been entered for the Horn area. The inspector stated *128 that these M. S. caps were somewhat more expensive and that their use depended upon the recommedation of either the blasting contractor or the inspector in charge who must base such request on consideration of the type of area and the amount of blasting required. He explained that the M. S. cap or ‘ millia second ” cap detonated 25 seconds before the dynamite itself exploded, thus breaking up the explosive force. He was unable to state, however, whether any explosive charges exceeded the safety limits, and admitted that no regulation governed the number of sticks of dynamite used. His records did not reveal the dates when inspectors visited the location.
The superintendent for the contractor testified that he was in charge of the construction work in the Horn area, but that the blasting was subcontracted, and that the State takes the soil borings, and not the contractor. His records did not indicate any vibration tests, but did reveal the distance from the Horn house to the Main Street bridge, where the blasting took place, as being 143 feet.
The defense expert, a licensed consulting engineer, testified that he inspected the Horn house on .May 24, 1963, examined every room, the garage and the exterior walls, and in his considered professional opinion, the cracks and damage complained of were a result of structural fatigue, temperature and humidity changes and not a consequence of vibration. He stated that he was familiar with the use of seismographic tests in the driving of piles, but that no readings were possible at a distance greater than five feet from the pile driver. He also stated as his opinion that concrete breakers could produce no structural damage at a distance greater than five feet from the road, and that the use of M. S. delayed blasting caps to dilute the explosive force was unnecessary on the Grand Central Parkway job.
At the commencement of the trial, the State moved to dismiss the claim on the ground that the acts claimed to have produced or caused the injuries were not shown to have occurred within 90 days before the filing of the notice of intention to file a claim on January 2, 1963. Decision on that motion was reserved. The motion was renewed at the conclusion of the trial. It is now denied. Subdivision 3 of section 10 of the Court of Claims Act requires a claim to be filed within 90 days after the accrual of such claim. The cases have uniformly held and the law is well settled that this period does not begin to run until the injured property owner can ascertain the full extent of his damages (Waterman v. State of New York, 19 A D 2d 264 [1963], affd. sub nom. Williams v. State of New York, 14 N Y 2d 793 [1964]; Dufel v. State of New York, 198 *129 App. Div. 97 [1921]; Allen v. State of New York, 208 Misc. 385 [1955], affd. 2 A D 2d 644 [1955]; Paduano v. State of New York, 203 App. Div. 503 [1922]; Kosciuszko v. State of New York, 15 Misc 2d 1009 [1959]). The court finds that the extent of damage in the instant matter could not have heen fully ascertained until the blasting activity facing the Horn property on Grand Central Parkway had come to a conclusion. Evidence was presented to show that blasting had occurred as late as October 22,1962.
The State also moved to dismiss the claim on the ground that the acts complained of were those of a independent contractor for which no liability attaches to the State. The general rule has been set forth in an old New York case, Berg v. Parsons (156 N. Y. 109) to the effect that a party who engages an independent contractor is not responsible for the negligence of that contractor or his employees, and that the doctrine of respondeat superior does not apply. Over the years, several exceptions to this rule have evolved, one of which is particularly pertinent in the instant matter. Where the work involved may be characterized as “inherently dangerous”, it has been held that the duties of the employer are nondelegable and that liability attaches for the negligence of the independent contractor, where lack of due care in the performance of the work has been demonstrated. (See Janice v. State of New York, 201 Misc. 915 [1951] as to nondelegability, and Schlansky v. Augustus V. Riegel, Inc., 9 N Y 2d 493 [1961] as to the required proof of negligence necessary for the recovery of damages, without physical trespass, as a result of blasting adjacent to a residence.)
The court holds that blasting in an urban community is inherently dangerous and that negligence has been demonstrated. The State’s second motion to dismiss is therefore also denied. The fact pattern here includes evidence that a State employee was charged with the responsibility of supervising the contractor’s work, which included the use and type of explosives employed, and that he relied upon compliance with the municipal ordinances and supervision by a Fire Department Inspector.
The court, therefore, must determine, on the basis of all the credible evidence before it, whether claimants’ damage resulted from procedures incidental to the road rebuilding. The court finds that the timing of the damage warrants crediting claimants’ expert’s theory of its cause.
The claimants presented, through their expert, testimony as to the cost of reparing their residence. No evidence was presented for the State on this aspect of the claim. The figures *130 given seemed reasonable for a house of this size and type, and the court accepts the proof presented, on which cross-examination resulted in no change in the price estimated.
‘ ‘ All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted.” (Travelers Ins. Co. v. Pomerantz, 246 N. Y. 63, 69 [1927]).
Accordingly, the court finds that claimants’ home was damaged as a result of blasting, concrete-breaking and pile driving negligently performed by the State’s contractor, that it was an inherently dangerous operation for which the State remains liable, and that the extent of this damage was $7,175, for which the claimants are entitled to an award, with interest from January 6, 1964, the date on which the claim was filed.