LEONA JANICE, as Limited Administratrix of the Estate of ALEXANDER JANICE, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30610.)

Court of Claims, October 18, 1951.

*Leyden E. Brown* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Edward R. Murphy* of counsel), for defendant.

LOUNSBERRY, P. J. Fort Ontario, near Oswego, is a State-owned public park, under the supervision and control of the New York State Department of Education, and located near a State housing project, the latter accommodating approximately one hundred families.

On November 25, 1950, Edward M. Plank, Harry Wise and Alexander Janice drove into said park to view the offshore waves which had arisen due to high winds blowing during that day. The three men arrived in Plank's car and drove onto the roadway which circles the old parade ground of the fort. Plank parked his car off the roadway and, together with Janice and Wise, walked to the top of the bank leading down to Lake Ontario. After watching the waves for a short time the three men started to return to their car, and walked westerly along the lake bank and turned south on a concrete roadway approximately twenty feet in width, a public thoroughfare, which passed less than ten feet from the west wall of a concrete block building which had been partially razed. Proceeding south on the road, they noticed that the roof had been removed from the building, but the end walls and the side walls appeared to be intact. The men were walking single file, Janice in the rear. As Wise reached a point about ten feet west of the southwest corner of the building he turned to speak to Janice. As he did so he saw the west wall of the building topple over on Janice, crushing his head against the concrete roadway, and killing him almost instantly.

The building, the west wall of which fell on Janice, was constructed of concrete building blocks, and was approximately sixty-four feet long, twenty-two feet wide, and eight feet high to the toe of the roof plate on the north and south walls. It had a peaked roof and the height from the ground to the peak of the west wall was approximately seventeen feet. Concrete blocks were used for all the walls and these extended from the ground to the two peaks of the roof. The building was erected between 1927 and 1929 and was so located that the two peaks were on the east and west ends, and referred to in the testimony as the east and west walls.

On the 14th day of November, 1950, the State, through the Commissioner of Education, entered into an agreement with one Dishaw for the demolition of the above-described building. For the sum of $25, to be paid to him by the State, and the salvage of any building materials he desired, Dishaw was to tear down the building. The agreement required Dishaw to demolish the building, clear the grounds in a manner satisfactory to the representative of the State, furnish all labor and material on the project, not to assign any interest in the agreement without written consent of the representative of the State, and to insure employees working on the project of demolition, as required by the New York State Workmen's Compensation Law. It was silent as to any particular methods of demolition to be employed

by Dishaw, or safety precautions to be taken for the protection of the public while demolition was in progress.

On November 25, 1950, the roof and all of the partitions and some of the flooring had been removed, leaving the four walls of the building standing without supports. Dishaw had allowed Leo Hibbert and his brother, Fred Hibbert, to assist him in demolishing the structure, and to take whatever material they desired. The Hibbert brothers had done most of the work, Dishaw having taken some of the partitions out and the stoop or landing off the east end of the building. Neither Dishaw nor the Hibbert brothers had ever demolished a building and none of them was or ever had been a building contractor. At no time while the demolition was in progress did any of them erect any barricades, warning signs or guardrails around the building, nor did they throw up any support, either interior or exterior, for any of the walls during the removal of the interior partitions, studding and flooring. Only about an hour before the Janice accident, part of the south wall fell in, injuring Leo Hibbert.

The wind on the day of the accident appears to have been unusually high reaching at one time, for a five-minute period, a velocity of forty-three miles per hour. It is not shown when this velocity was reached however, and the bulk of the evidence indicates that the highest winds, and most of the wind damage, occurred in the evening, or about two hours after the accident.

In its defense to this claim for the wrongful death of Mr. Janice, the State asserts, first, that there was no negligence involved and, second, that even if there was any negligence, the independent contractor, not the State, would be liable therefor.

We think there was negligence. No warnings or barriers of any sort were posted or erected, despite the fact the work of demolition was proceeding in a public place, near a public roadway, and also near a large housing project. Further, the work of demolition was not conducted in a prudent manner. The record shows that the approved method of demolition of a building of this type was, after the removal of the roof, to next remove the walls before removing the support afforded by the interior partitions and floor. The method actually employed resulted in leaving a wall about seventeen feet high at the peak, standing without interior support or any other support, except such as was afforded by the much lower side walls. The event proved what should have been obvious in the first place, namely, that such a wall could easily topple over.

We cannot agree with the State that the wind was the sole cause of the accident. In all probability it was an important contributing factor but we doubt that the wall would have collapsed had it not been weakened and exposed by the demolition proceedings. Wind was one of the hazards to be anticipated, and in the absence of convincing evidence that the wind at that time was so extraordinary as to be beyond the scope of reasonable anticipation we do not find that it constituted such an independent intervening cause as to break the chain of causation leading from the negligent acts and omissions in the performance of the work to the ensuing accident. (*Meyer* v. *Haven*, 37 App. Div. 194; *Daly* v. *State of New York*, 262 App. Div. 661, affd. 288 N. Y. 551.)

It is true, of course, that these acts and omissions were actually performed or omitted by the contractor. To the general rule that the owner or employer is not responsible for the negligence of an independent contractor there are, however, a number of exceptions, all based on the concept that there are certain legal duties and responsibilities which can not be avoided by delegation to another.

One of these exceptions is that an employer is subject to a nondelegable duty with respect to work which in the natural course of events will produce injury unless certain precautions are taken. As this doctrine is expressed in the leading case of *Bower* v. *Peate* (1 Q. B. D. 321, 326–327 [1876]): " a man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise, unless means are adopted by which such consequences may be prevented, is bound to see to the doing of that which is necessary to prevent the mischief, and cannot relieve himself of his responsibility by employing someone else — whether it be the contractor employed to do the work from which the danger arises or some independent person — to do what is necessary to prevent the act he has ordered to be done from becoming wrongful. There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted. While it may be just to hold the party authorizing the work in the former case exempt from liability for injury, resulting from negligence which he had no reason to anticipate, there is, on the other hand, good ground for holding him liable for injury caused by an act certain to be attended with injurious conse-

quences if such consequences are not in fact prevented, no matter through whose default the omission, to take the necessary measures for such prevention may arise.''

Examples of the application of such doctrine may be found in *Hooey* v. *Airport Constr. Co.* (253 N. Y. 486), where a newly laid wall was blown over by wind, in *McNulty* v. *Ludwig & Co.* (153 App. Div. 206), where the owner was held liable for the falling of an insecurely fastened sign which had been so fastened by an independent contractor, in *Hudgins* v. *Hann* (240 F. 387), where a wall which had been damaged by fire fell while in the course of repair by an independent contractor, in *Hughes* v. *Harbor & Suburban Bldg. & Sav. Assn.* (131 App. Div. 185), where under very similar circumstances a brick fell from a wall under repair, and in *Kuhn* v. *Carlin Constr. Co.* (154 Misc. 892), where an employer engaged a steamship with a defective boiler to transport workmen. In all these cases the court held in effect that the work was such as to be likely to produce injury unless accompanied by precautions to guard against the same and that the owner could not escape responsibility for the failure to use safeguards merely by engaging someone else to do the work. The rule is the subject of an extensive annotation (23 A. L. R. 1016).

A second exception, closely akin to the first mentioned, is that an employer or owner remains liable for injuries caused by the failure of an independent contractor to exercise due care in respect to the performance of work which is inherently or intrinsically dangerous. Inherently or intrinsically dangerous work has been variously defined, usually to the effect that it is work necessarily attended with danger, no matter how skillfully or carefully it is performed. Application of this rule has led to a wide divergence in the cases, however, because of varying interpretations as to what sort of work is inherently dangerous. The writer in the annotation on this subject (23 A. L. R. 1084) suggests, very soundly we think, that the rule might well be rephrased to impose liability on the owner or employer where the work is of such nature as, under the general law of negligence, to require the exercise of ''a high degree of care.''

Whether or not the demolition of a building is inherently dangerous work has been variously decided under varying states of fact. (57 C. J. S., Master and Servant, § 590; note, 23 A. L. R. 1084.) In *Engel* v. *Eureka Club* (137 N. Y. 100) the court held that demolition of a brick wall was not inherently dangerous, and, consequently, the owner was not held liable where the wall collapsed through negligence of the contractor.

On the other hand, in *Hanley* v. *Central Sav. Bank* (255 App. Div. 542, affd. 280 N. Y. 734) the court stated that demolition of a building along a public street in a crowded city should be considered as inherently dangerous. In the *Engel* case the brick wall was not along a crowded street, and, furthermore, in the decision of that case, the court seems to have given no consideration to the likelihood that the work was of such nature as to be dangerous unless certain precautions were taken, even if it was not, strictly speaking, inherently dangerous.

Still another rule of law which constitutes an exception to the independent contractor doctrine is that there is a nondelegable duty on the person in possession of land or other fixed property to keep his premises in such state that invitees shall not be unduly exposed to danger. Under this rule the employment of an independent contractor to do work likely to render the premises dangerous to invitees does not relieve the owner from his duty to see that due care is used to protect such persons. (*Petluck* v. *McGoldrick Realty Co.* (240 App. Div. 61; note, 23 A. L. R. 984, 1011).

In addition, a whole series of cases involving obstructions, excavations and openings, in or near public thoroughfares, have built up a rule that a person who employs a contractor to do work in a place where the public is in the habit of passing, which will endanger the public unless precautions are taken, must see that the necessary precautions are in fact taken. (*Storrs* v. *City of Utica*, 17 N. Y. 104; *Boylhart* v. *DiMarco & Reimann, Inc.*, 270 N. Y. 217; 57 C. J. S., Master and Servant, § 590; 23 A. L. R. 984, 1008.) Obviously this rule stems from the same general principle underlying the others herein mentioned.

Finally, another exception to the general independent contractor rule is that the employer remains liable if he fails to use reasonable care to select a competent contractor, if it turns out that the contractor was in fact incompetent.

In the light of the foregoing rules and principles, it seems to us that liability has been established against the State in the present case. Under the authority of *Hanley* v. *Central Sav. Bank* (255 App. Div. 542, affd. 280 N. Y. 734, *supra*) the work could well be found to be inherently dangerous. No matter how carefully the contractor had proceeded, the fact remains that at one point in his work a seventeen-foot wall would have been standing with its top portion unsupported by anything. Common experience indicates that such a wall is none too stable and may collapse without negligence on the part of anyone. Even, however, if the work was not inherently dangerous, it

was certainly likely to cause injury to persons properly upon the premises unless precautions to safeguard them were taken. As it has already been indicated, neither the State nor the contractor took any precautions whatever. An important further consideration is that the building stood in a public place to which the public was invited, near a public way.

The whole record indicates a complete lack of attention by the State to the danger involved in the work. The contractor engaged to perform it had no previous experience in demolition of buildings. The contract contained no reference whatever to the observance of any precautions or safeguards. The State made no effort to see that the work was properly performed or that any barriers or warnings were erected. For these omissions we are satisfied that it cannot hide behind the independent contractor but must itself respond in damages for the ensuing accident.

The decedent was forty-three years of age, was earning an average of $91 per week, and was survived by his widow but no children. The funeral expenses were $545.

We make an award of $20,000 for the wrongful death of the deceased and the sum of $545 for funeral expenses, or a total of $20,545, with interest thereon from the 25th day of November, 1950, to the date of entry of judgment.

Let judgment be entered accordingly.