Jami N. HUDDLESTON and Jenifer B. Huddleston, minors, by their parent and next friend, Judith C. HUDDLESTON, Petitioners,

v.

UNION RURAL ELECTRIC ASSOCIATION, Respondent.

No. 91SC503.

Supreme Court of Colorado, En Banc.

Nov. 23, 1992.

Breit, Best, Richman and Bosch, P.C., John L. Breit, Bradley A. Levin, Frank W. Coppola, Denver, Pryor, Carney and Johnson, P.C., Thomas L. Roberts, Elizabeth C. Moran, Englewood, for petitioners.

Hall & Evans, Alan Epstein, Peter F. Jones, Robert J. McCormick, Denver, for respondent.

Justice LOHR delivered the Opinion of the Court.

This case arises out of an airplane accident and presents issues concerning the scope of the "inherently dangerous activity" exception to the rule that one who employs an independent contractor is not liable for torts committed by the independent contractor or its servants. In an action by the children of a passenger killed in a crash of a single engine plane against Union Rural Electric Association (UREA), which engaged a contract flight service to make the wintertime mountain flight that resulted in the passenger's death, the district court entered judgment for the plaintiffs based on a jury verdict. The Colorado Court of Appeals reversed and directed that the action be dismissed. *Huddleston v. Union Rural Elec. Ass'n*, 821 P.2d 862 (Colo.App.1991). The court held that as a matter of law the activity of the contractor was not inherently dangerous and that the district court therefore erred in denying the motion of UREA for a directed verdict. *Id.* We granted certiorari and now reverse and remand for a new trial.

I

Some of the pertinent facts have been stipulated, and others appear in the record without contradiction. UREA is a rural electric cooperative corporation that supplies power to customers in certain Colorado counties along the front range. Early in 1987, legislation proposed by UREA was pending in the Colorado General Assembly, and UREA had hired an organization of

which James Huddleston was a part to provide lobbying services. In furtherance of the effort to secure passage of the legislation, UREA wished to seek the support of other rural electric cooperatives. One such organization was San Miguel Power Association, which served certain areas on Colorado's western slope. At least a week before a meeting of the board of directors of San Miguel Power Association scheduled for January 28, 1987, in Nucla, Colorado, UREA's executive secretary called Charles L. Brooks, who operated a charter airplane service, and arranged for him to transport UREA representatives to the meeting. They agreed on the use of a single engine aircraft. On January 28, Brooks piloted a single engine Cessna aircraft on a trip from the Jefferson County airport, with Nucla as the destination. On board were two directors of UREA and James Huddleston. The plane subsequently crashed into a mountain near Nucla killing all occupants of the aircraft.[1]

Judith Huddleston, the wife of decedent James Huddleston, brought this action in Boulder County District Court as parent and next friend of the couple's two children, Jami N. Huddleston and Jenifer B. Huddleston. The plaintiffs asserted a claim for negligent hiring of pilot Brooks and also asserted that UREA was accountable for Brooks' negligence on the basis of respondeat superior because the activity in which Brooks was engaged was "inherent-

ly dangerous," thereby qualifying for an exception to the general rule that an employer of an independent contractor is not liable for injuries resulting from the negligence of the contractor.[2]

UREA moved to dismiss the claim grounded on respondeat superior on the basis that as a matter of law "aviation is not inherently dangerous and the operation of a charter service does not subject the party who charters the plane to vicarious liability." As part of the same motion, UREA sought summary judgment on the negligent hiring claim. The district court granted the motion for summary judgment on the negligent hiring claim.[3] It concluded, however, that it could not find as a matter of law that the activity in question was not inherently dangerous, and therefore denied the motion to dismiss the respondeat superior claim.

The case was tried to a jury. Prior to trial, the parties stipulated that the crash that caused the death of James Huddleston occurred as a direct and proximate result of the negligence of Brooks. They also stipulated that Brooks was an independent contractor and not an employee of UREA.[4]

After presentation of all the evidence, UREA moved for a directed verdict, again asserting that as a matter of law the activity in which Brooks was engaged was not inherently dangerous. The district court denied the motion, and the jury subse-

---

1. Because the parties stipulated at trial that the negligence of Brooks was the direct and proximate cause of the crash, no direct evidence was ever introduced concerning the specific cause of the crash. *See infra* note 4. The testimony of several witnesses, however, was based on the assumption that a winter storm played an important role in the accident, and this is consistent with the National Transportation Safety Board's aviation accident report introduced as plaintiffs' exhibit D.

2. The amended complaint, upon which the case was tried, was limited to the claims and parties described. The original complaint named additional defendants and asserted additional claims. The nature, history, and disposition of these claims have no relevance to the issues before us on certiorari review.

3. The plaintiffs did not appeal the dismissal of the negligent hiring claim.

4. In full, the stipulation as read to the jury provided:

Number one, the UREA contracted with Charles Brooks to perform a business charter flight on January 28, 1987 from Jeffco Airport in Broomfield to Nucla, Colorado. Two, the contract between UREA and Charles Brooks was initially entered into on or about January 26, 1987. Paragraph three, Doug Huddleston was a paid consultant to the UREA and was authorized to be on the accident flight. Four, the airplane crashed 17 miles northeast of Nucla Airport as a direct result of the carelessness and negligence of Charles Brooks. Five, the negligence of Charles Brooks was the proximate cause of the crash of the airplane that caused the death of James Douglas Huddleston. Six, Charles Brooks was an independent contractor. He was not an employee of UREA.

quently returned a verdict for the plaintiffs in the amount of $525,000. The court entered judgment against UREA based on the jury verdict.

UREA appealed to the Colorado Court of Appeals. The court held that "the proper test to determine whether an activity is 'inherently dangerous' is whether danger 'inheres' in performance of the activity no matter how skillfully performed" and that "if there is a way to perform the ... activity without danger, ... then the activity is not 'inherently dangerous.'" *Huddleston*, 821 P.2d at 864 (citations omitted). Relying on the proposition that construction of a contract is a matter of law for a court to decide, the court then defined the activity for which Brooks was hired according to its interpretation of the agreement between Brooks and UREA. *Id.* at 865. It found that the parties had agreed that Brooks would safely transport Huddleston to Nucla by a single engine airplane, and that Brooks was not required by contract to proceed with the flight in the event of adverse weather conditions. *Id.* at 866. Taking notice that air transportation, in general, is far safer than automobile transportation, and applying what it found to be the proper test for determining whether an activity is inherently dangerous, the court held that reasonable minds had to agree that the contracted-for activity was not inherently dangerous. *Id.* Therefore, according to the court of appeals, "UREA was not vicariously liable under the 'inherent danger' exception to the general rule of employer non-liability," and the district

court erred in denying UREA's motion for a directed verdict. *Id.*

We granted certiorari to review the court of appeals' judgment, and now hold that the court of appeals erred both by applying an incorrect test to determine whether an activity is inherently dangerous and by defining that activity only or primarily according to its interpretation of the independent contractor's contractual obligations. We further hold that the plaintiffs produced sufficient evidence at trial to create an issue of fact for the jury as to whether all the elements of the "inherently dangerous activity" exception to the general rule of nonliability for the negligence of an independent contractor were proven by a preponderance of the evidence. However, because the jury instructions did not adequately apprise the jury of the elements of the inherently dangerous activity exception, we remand to the court of appeals with directions that it order a new trial in this case.

## II

In *Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978), we again recognized the "inherently dangerous activity" exception to the general rule that employers of independent contractors are not liable for the torts of their contractors. *Id.* at 378, 578 P.2d at 1050. *See Garden of the Gods Village v. Hellman*, 133 Colo. 286, 295, 294 P.2d 597, 602 (1956). We now reaffirm the inherently dangerous activity exception[5] and further

---

**5.** Although the inherently dangerous activity exception is well established at common law, no consistent and uniform definition of "inherently dangerous activity" has emerged. *See, e.g., Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1303 (D.C.Cir.1985) (the inherently dangerous activity exception applies "when an employer has reason to know that his independent contractor is likely, *under particular circumstances*, to endanger others absent reasonable precautions"); *Jones v. Power Cleaning Contractors*, 551 So.2d 996, 999 (Ala.1989) ("[I]f the work was of a nature such that 'injury would probably result ... unless it was performed with due care,' the work will be considered 'inherently or intrinsically dangerous.'") (quoting 41 Am.Jur.2d *Independent Contractors* § 41 (1968)); *Madison v. Midyette*, 541 So.2d 1315, 1317–18 (Fla.Dist.Ct.

App.1989) (an activity is inherently dangerous if "'danger *inheres in the performance of the work;* and it is sufficient if there is a recognizable and substantial danger inherent in the work, even though a major hazard is not involved'") (quoting *Florida Power and Light Co. v. Price*, 170 So.2d 293, 295 (Fla.1964)), *aff'd, Midyette v. Madison*, 559 So.2d 1126 (Fla.1990); *Ballinger v. Gascosage Elec. Coop.*, 788 S.W.2d 506, 510 (Mo. 1990) ("'*Inherently dangerous activity is that which necessarily presents a substantial risk of damage unless adequate precautions are taken*'") (quoting and adding emphasis to *Smith v. Inter–County Tel. Co.*, 559 S.W.2d 518, 523 (Mo. 1977)) (overruled by *Zueck v. Oppenheimer Gateway Properties*, 809 S.W.2d 384, 390 (Mo. 1991), but only to the extent that *Ballinger* also holds that the inherently dangerous activity ex-

articulate guidelines for its application. We consider first the policy objectives behind the exception and then the legal bases from which the exception is derived. We conclude that the court of appeals misinterpreted the exception in this case.

### A

The inherently dangerous activity exception is based on two primary policy concerns. The first is that employers whose enterprises directly benefit from the performance of activities that create special and uncommon dangers to others should bear some of the responsibility for injuries to others that occur as a result of the performance of such activities. *See* Fleming James, Jr., *Vicarious Liability*, 28 Tul. L.Rev. 161, 169–70, 172 (1954) (explaining that a policy behind vicarious liability in general has been that those for whose benefit and at whose direction risks are imposed on others should share the cost of losses incurred as a result of such risks).[6] This accords with basic intuitions of fairness, and it is also consistent with what is often efficient economically.[7] The second is that it is sound public policy with regard to inherently dangerous activity "to have another layer of concern in order to try to ensure that activity that is inherently dangerous gets enough attention so that we

reduce the number of people who are injured." Tr. at 158–59, *Huddleston v. Union Rural Electric Ass'n* (Boulder County Dist.Ct. Feb. 6, 1990) (No. 88CV2012) (Bellipanni, J., ruling from the bench on defendant's motion for a directed verdict). In other words, with regard to inherently dangerous activities, it is desirable that employers have an added incentive to encourage their independent contractors to take all reasonably feasible precautions against injury to others.

### B

As a general rule, a person hiring an independent contractor to perform work is not liable for the negligence of the independent contractor. *E.g., Thayer v. Kirchhof,* 83 Colo. 480, 484, 266 P. 225, 226–27 (1928); *see Restatement (Second) of Torts* § 409 (1964). In *Garden of the Gods,* however, this court adopted the widely recognized rule that "[w]hen work to be done is dangerous in itself, or is of a character inherently dangerous unless proper precautions are taken, an employer cannot evade liability by engaging an independent contractor to do such work." *Garden of the Gods,* 133 Colo. at 295, 294 P.2d at 602. In *Western Stock,* we drew upon section 427 of the *Restatement (Second) of Torts* and

ception applies to employees of independent contractors covered by workers' compensation); *Saiz v. Belen Sch. Dist.,* 113 N.M. 387, 396, 827 P.2d 102, 111 (1992) ("Activities that are 'inherently dangerous' represent an intermediate category of hazardous activity between those that are nonhazardous (or only slightly so), in which harm is merely a foreseeable consequence of negligence, and activities that are ultrahazardous, in which the potential for harm cannot be eliminated by the highest degree of care."); *Mentzer v. Ognibene,* 408 Pa.Super. 578, 597 A.2d 604, 611 (1991) (the inherently dangerous exception applies if a reasonable person, in the position of the employer, would recognize the need to take special measures, and the risk is different from the usual and ordinary risk associated with the general type of work done), *appeal denied,* 530 Pa. 660, 609 A.2d 168 (Pa. 1992).

6. A closely related concern is that if an employer has the ability to select an independent contractor who is responsibly insured, either through itself or a third party, for carrying on

activities that create special and uncommon dangers to others, then it is desirable to have a rule of law that encourages employers to select such a contractor. *See* Clarence Morris, *The Torts of an Independent Contractor,* 29 Ill.L.Rev. 339, 342–43 (1934).

7. *See* Alan O. Sykes, *The Economics of Vicarious Liability,* 93 Yale L.J. 1231, 1271–73 (1984). Sykes defines the relative efficiency of a liability rule by applying the following analysis: "[rule] *A* is efficient relative to [rule] *B* if the members of society who prefer *A* to *B* can compensate the members of society who prefer *B* to *A* and remain better off themselves." *Id.* at 1232 n. 5. Sykes reasons that if the activity in question requires particular precautions, the employer can require them by contract and provide that failure to undertake them will result in some adequately severe penalty. *Id.* at 1272. Furthermore, because many inherently dangerous activities present inexpensive opportunities for the employer to verify that precautions are being observed, "[v]icarious liability is clearly efficient for many inherently dangerous activities." *Id.* at 1271–72.

described an inherently dangerous activity as one " 'involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work,' " *Western Stock,* 195 Colo. at 378, 578 P.2d at 1050 (quoting from section 427 of the Second Restatement), but then added, somewhat paradoxically, that the work or activity "must only present a foreseeable and significant risk of harm to others if not carefully carried out." *Id.* We now are persuaded that *Western Stock* does not adequately identify the legal criteria by which to determine whether an activity may properly be characterized as "inherently dangerous" for purposes of the rule of vicarious liability. Instead of relying solely upon *Western Stock* as the standard for resolving whether an activity is inherently dangerous, we must therefore look to several provisions of the *Restatement (Second) of Torts* and related case law to supply the appropriate analytical framework for answering that question.

Section 427 of the *Restatement (Second) of Torts* carves out a limited exception to the general rule of nonliability for the negligence of an independent contractor by providing as follows:

> One who employs an independent contractor to do work involving a *special danger* to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

(Emphasis added.) As framed, section 427 creates a rule of vicarious liability making the employer liable for the negligence of the independent contractor in failing to guard against a special danger, irrespective of whether the employer has itself been at fault. *See Restatement (Second) of Torts,* introductory note at 394. However, this rule of vicarious liability "applies only where the harm results from the negligence of the contractor in failing to take precautions against the danger involved in the work itself, which the employer should contemplate at the time of his contract," *id.* § 427 cmt. d, and does not apply "where the negligence of the contractor creates a new risk, not inherent in the work itself or in the ordinary or prescribed way of doing it, and not reasonably to be contemplated by the employer." *Id.* Section 427, in other words, does not apply to the " 'collateral negligence,' " *id.,* of the independent contractor, where "collateral negligence" [8] means the following: It is negligence of the independent contractor that occurs after the independent contractor has departed from the ordinary or prescribed way of doing the work, when such departure is not reasonably to have been contemplated by the employer, and when such negligence would not have occurred but for such a departure. In the event that such a departure is by itself a negligent act or omission on the part of the independent contractor, that too is "collateral negligence." What is common in either case is that "collateral negligence" is negligence not reasonably to have been contemplated by the employer,

---

8. Useful guidance in understanding the concept of "collateral negligence" is to be found in § 426 of the *Restatement (Second) of Torts,* which states:

> Except as stated in §§ 428 and 429, an employer of an independent contractor, unless he is himself negligent, is not liable for physical harm caused by any negligence of the contractor if
> (a) the contractor's negligence consists solely in the improper manner in which he does the work, and
> (b) it creates a risk of such harm which is not inherent in or normal to the work, and

> (c) the employer had no reason to contemplate the contractor's negligence when the contract was made.

This exception has been explained as representing "little more than a negative statement of [the inherently dangerous activity exception], describing the type of situation in which the special danger is not necessarily involved in the work to be done, and not contemplated in connection with the way it is expected to be done." W. Page Keeton, et. al., *Prosser and Keeton on the Law of Torts* § 71, at 515 (5th ed. 1984). Comment d to section 427 provides that "[t]he rule stated in § 426 is the converse of the rule stated [in § 427], and the two should be read together."

in contrast to negligence reasonably to have been contemplated as a recognizable risk associated with the ordinary or prescribed way of doing the work under the circumstances.

Although the comments to section 427 of the *Restatement (Second) of Torts* do not define "special danger," *id.* § 427, helpful insight into the meaning of this term can be gleaned from other sections of the *Restatement,* such as section 416, which is closely related to section 427 and represents a different form of the same general principle stated in section 427. *See id.* § 416 cmt. a. Section 416 of the *Restatement (Second) of Torts* states:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a *peculiar risk* of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

(Emphasis added.) Comment d to section 416 defines a "peculiar risk" as "a risk differing from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community."

Comment b to section 416 incorporates by reference comment b to section 413 with respect to the meaning of both "peculiar risk" and "special precautions." [9] When these comments are read together, it is clear that the independent contractor's failure to take precautions against an ordinary or customary danger does not create the type of "special or peculiar danger" to which the "inherently dangerous" activity exception applies. *Id.* § 413 cmt. b. Rather, it is the work itself, or the particular circumstances under which the work is to be performed, that must create the special type of danger that is not ordinarily present in the type of activities to which persons are generally subjected in the community. *See, e.g., Wilson v. Good Humor Corp.,* 757 F.2d 1293, 1304 (D.C.Cir.1985) (inherent danger depends on the nature of the work and the fact-specific circumstances under which the work is to be performed); *Stark v. Weeks Real Estate,* 94 Cal.App.3d 965, 156 Cal.Rptr. 701, 705 (1979) (peculiar risk is a risk peculiar to the work to be done and arises out of its character and place of performance); *Lunde v. Winnebago Indus., Inc.,* 299 N.W.2d 473, 476 (Iowa 1980) (the peculiar risk must inhere in the work itself as performed in its usual or normal manner); *Reilly v. Highman,* 185 Kan. 537, 345 P.2d 652, 656 (1959) (contemplated conditions under which the work is to be done and the known circumstances attending it are important considerations in determining whether work constitutes an inherently dangerous activity). For purposes of the "inherently dangerous" activity exception, therefore, the focus is on dangers recognizable in advance or contemplated by the

---

**9.** Although § 413 of the *Restatement (Second) of Torts* is not directly applicable in this case (§ 413 falls under chapter 15, topic 1, "Harm Caused by Fault of Employers of Independent Contractors," whereas §§ 416 and 427 fall under chapter 15, topic 2, "Harm Caused by Negligence of a Carefully Selected Independent Contractor"), comment b to § 413 provides some additional insight into the meaning of "peculiar risk," a term common to both §§ 413 and 416:

> This Section is concerned with special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions. "Peculiar" does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself.

*Id.* § 413 cmt. b. Many courts treat the terms "peculiar risk" and "special danger" as being equivalent. *See Samhoun v. Greenfield Const. Co.,* 163 Mich.App. 34, 413 N.W.2d 723, 727 (1987) (per curiam); *Saiz v. Belen Sch. Dist.,* 113 N.M. 387, 394 n. 6, 827 P.2d 102, 109 n. 6 (1992); *Mentzer v. Ognibene,* 408 Pa.Super. 578, 597 A.2d 604, 610 n. 7 (1991), *appeal denied,* 530 Pa. 660, 609 A.2d 168 (Pa.1992).

employer as being "inherent" in the activity, or the circumstances of performance, when carried out in its ordinary way, and not on risks created by or following from the contractor's unforeseeable departure from the ordinary or prescribed way of performing the work under the circumstances.

■■■ Against this backdrop of the *Restatement (Second) of Torts* and related case law, we conclude that an activity will qualify as "inherently dangerous" when it presents a special or peculiar danger to others that is inherent in the nature of the activity or the particular circumstances under which the activity is to be performed, that is different in kind from the ordinary risks that commonly confront persons in the community, and that the employer knows or should know is inherent in the nature of the activity or in the particular circumstances under which the activity is to be performed. In addition, although an activity may be inherently dangerous, an employer will not be liable for injuries caused by the collateral negligence of its independent contractor in performing that activity.

### C

The court of appeals held that because the activity for which Brooks was hired could have been performed without danger, such activity could not have been inherently dangerous. *Huddleston,* 821 P.2d at 866. *Accord id.* at 864 ("[T]he proper test

to determine whether an activity is 'inherently dangerous' is whether danger 'inheres' in performance of the activity no matter how skillfully performed" and "if there is a way to perform the . . . activity without danger, . . . then the activity is not 'inherently dangerous.'") (citations omitted).

■■■ This, however, is not the correct test, for an activity may be inherently dangerous even if it can be performed safely by taking proper precautions, *Restatement (Second) of Torts* § 427 cmt. b ("[i]t is not . . . necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others"). In other words, the court of appeals erred by selecting a test that requires an activity to be more dangerous than it needs to be in order to be classified as inherently dangerous for the purpose of applying the inherently dangerous activity exception to the general rule that employers are not liable for the torts of their independent contractors.[10]

### III

Once the correct standard by which to determine whether an activity is inherently dangerous has been identified, it is still necessary to define the activity to which that standard should be applied. The court of appeals took the approach that the activity to which the standard is to be applied should be defined by the independent contractor's contractual obligations to the em-

---

10. The test employed by the court of appeals seems more appropriately suited to determining whether an activity is abnormally dangerous within the meaning of § 520 of the Second Restatement. *See Restatement (Second) of Torts* § 520 (1976) ("In determining whether an activity is abnormally dangerous, the following factors are to be considered: . . . (c) inability to eliminate the risk by the exercise of reasonable care;"). A few other jurisdictions appear also to have taken this approach. *See, e.g., Eastern Airlines v. Joseph Guida & Sons Trucking Co.,* 675 F.Supp. 1391, 1396 (E.D.N.Y.1987) ("[I]n order for the work to be inherently dangerous, it must be '"attended with danger, no matter how skillfully or carefully it is performed."'") (quoting *Carmel Associates, Inc. v. Turner Construction Co.,* 35 A.D.2d 157, 314 N.Y.S.2d 941 (1st Dep't 1970) (quoting *Janice v. New York,*

201 Misc. 915, 107 N.Y.S.2d 674, 679 (1957))); *Ft. Lowell–NSS Ltd. Partnership v. Kelly,* 166 Ariz. 96, 800 P.2d 962, 971 (1990) (in order to be inherently dangerous, "work must involve a risk of harm that cannot be eliminated by exercising reasonable care"); *Smith v. Zellerbach,* 486 So.2d 798, 802 (La.App.1986) ("The critical inquiry in determining whether an activity is 'inherently or intrinsically dangerous,' and therefore non-delegable, is whether it *can be made safe* when it is performed in a proper and workmanlike manner."), *cert. denied,* 489 So.2d 246 (La.1986). *Cf. Balagna v. Shawnee County,* 233 Kan. 1068, 668 P.2d 157, 168 (1983) (implying that if a type of work is safe when proper precautions are taken, then it cannot be inherently dangerous). This, however, is not the law in Colorado.

ployer, and that, therefore, the definition of the activity in question is a matter of the interpretation of a contract. As we shall explain, this approach is flawed because it fails to recognize that when the inherently dangerous activity exception applies and the negligence of the independent contractor is not collateral to the work, the law invokes the theory of respondeat superior, according to which an employer may be liable for the tort of its agent even if the agent acted in violation of the employer's express instructions. *See infra* part III B. But before we do that, the decision of the court of appeals also raises an issue regarding the interpretation of oral contracts which, although we need not resolve it, deserves comment in order to obviate the potential for confusion. *See infra* part III A.

### A

The court of appeals thought that "[t]he issue before [it was] ... whether the specific terms and details of the contracted activity were ... in dispute based on the evidence and, if not, whether reasonable minds could differ on whether ... the contracted activity was 'inherently dangerous.' " *Huddleston*, 821 P.2d at 865. In taking that approach, the court began with a rule that "inasmuch as contract construction is a matter of law, the appellate court

is not bound by the findings and conclusions of the trial court." *Id.* (citing *Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.*, 633 P.2d 1081 (Colo.1981)). In *Gran Prix Imports*, however, we were faced with the interpretation of a writing, and our holding was that "the determination of ambiguity *in a document* is a question of law and ... this court is not bound by the findings of the trier of fact." *Gran Prix Imports*, 633 P.2d at 1083 (emphasis added). *Accord Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) ("Interpretation of a *written* contract and the determination of whether a provision in the contract is ambiguous are questions of law, and this court need not defer to the trial court's interpretation of the contract.") (emphasis added); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984) ("Interpretation of a *written* contract is generally a question of law for the court.") (emphasis added).

In contrast with *Gran Prix Imports*, *Pepcol*, and *Fibreglas Fabricators*, there is no evidence in this case that there is a document to interpret or that there ever was a written agreement between Brooks and UREA concerning the flight to Nucla.[11] Furthermore, this court has not yet ruled on the specific and proper allocation of functions between the court and a jury when the issue is the interpretation or construction of a purely oral agreement.[12]

---

**11.** The evidence in the record of an agreement between Brooks and UREA consists of the following: The executive secretary of UREA testified that she believed she had authority to arrange with Brooks for the flight, that she called Brooks about a week before the flight, that she "asked if he was available and if he would be able to fly a couple of our directors [to Nucla] and the obvious," that she and Brooks discussed prices of both twin and single engine planes, that the day before the flight she spoke again with Brooks and she "discussed the weather with him ... and he reassured [her] that he didn't think it would be a problem [because he had checked with some weather service,]" that she was "fairly sure" she gave Brooks one of the director's phone numbers in case there was a problem in the morning when Brooks checked the weather again, and that she had spoken with the people in Nucla and told them UREA would reschedule for a future date if the flight had to be canceled for "weather or whatever." An interim manager of UREA testified in general that it was UREA's practice to "always consider[ ]

the safety of the people that were going to fly and if the weather looked bad, we just would not fly, we just canceled our flight." The parties also stipulated that "UREA contracted with Charles Brooks to perform a business charter flight on January 28, 1987 from Jeffco Airport in Broomfield to Nucla, Colorado," and that "the contract ... was initially entered into on or about January 26, 1987."

**12.** Other courts seem generally to agree that "whether an oral contract exists, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact.... [But] when there is no conflict in the evidence as to the terms of the oral agreement, or the words of the oral agreement can have but one meaning, construction of the agreement is one of law for the court's determination...." *Jim's Water Service, Inc. v. Alinen*, 608 P.2d 667, 669–70 (Wyo.1980). *See also Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.2d 316, 324 (1970) ("When the words of the oral

Nor need we reach today the issues of whether the court of appeals correctly took it upon itself to construe the oral agreement or whether, when faced with construing the agreement, the court of appeals interpreted it correctly. Instead, we simply start with the assumption, without expressing any opinion on the matter, that the court of appeals correctly determined that there was a contract between Brooks and UREA, that the contract required "that Brooks *safely* transport Huddleston and two UREA board members from Jefferson County to Nucla on January 28, 1987," *Huddleston,* 821 P.2d at 866 (emphasis added), and that it "was not a condition of the contract that Brooks proceed with the flight regardless of existing weather conditions." *Id.*

**B**

In *Western Stock,* we held that when the inherently dangerous activity exception is applicable, " 'the law invokes the theory of respondeat superior, imposing the master-servant relationship upon the parties engaged in the activity.' " *Western Stock,* 195 Colo. at 378, 578 P.2d at 1050 (quoting *Epperly v. City of Seattle,* 65 Wash.2d 777, 399 P.2d 591 (1965)). Under the theory of respondeat superior, "[a]n employer

may be held responsible for tortious conduct by an employee only if the tort is committed within the course and scope of employment." *Destefano v. Grabrian,* 763 P.2d 275, 286 (Colo.1988). Generally, "[a]n employee is acting within the scope of his employment if he is engaged in the work which has been assigned to him by his employer or he is doing what is necessarily incidental to the work which has been assigned to him or which is customary within the business in which the employee is engaged." *Id.* at 287. Moreover, it is widely recognized that "[i]f the tortious act is within or incident to an employee's authorized duties, the employer is liable even if the employee acted in violation of the employer's instructions." *Fahey v. Rockwell Graphic Systems, Inc.,* 20 Mass.App.Ct. 642, 482 N.E.2d 519, 527 (1985), *rev. denied,* 396 Mass. 1103, 485 N.E.2d 188 (1985).[13] In short, "[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment," *Restatement (Second) of Agency* § 230 (1958), and "[a] master cannot avoid responsibility for the negligence of a servant by telling him to act carefully." *Id.* § 230 cmt. b.

In the case before us, therefore, it is not dispositive if UREA's agreement

agreement can have only one meaning, there exists no grounds upon which reasonable minds might differ and the question becomes one of law for determination by the court."); *Tallackson Potato Co., Inc. v. MTK Potato Co.,* 278 N.W.2d 417, 422 (N.D.1979) ("A determination of [the terms of an oral contract], if they are disputed, must ... be made by the trier of fact.... After the terms of the oral contract have been determined, the issue of the parties' intentions, if ascertainable from those terms, involves a question of law.... Yet, if the parties' intentions are not ascertainable from the terms of the oral contract and must therefore be established by extrinsic evidence, the question once again becomes one for the trier of fact and this court will reverse on appeal only if 'clearly erroneous.' ").

13. *Accord Lutz v. United States,* 685 F.2d 1178, 1182 (9th Cir.1982) ("[T]he fact that the employee deviates from [the employer's] express instructions or acts 'in utter disobedience thereof' generally does not relieve the employer of liability. The test of the [employer's] liability is not whether the [act] was committed in accordance

with the master's instructions but whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master.' ") (citations omitted) (quoting *Keller v. Safeway Stores, Inc.,* 111 Mont. 28, 108 P.2d 605, 611 (1940) and *Kornec v. Mike Horse Mining & Milling Co.,* 120 Mont. 1, 180 P.2d 252, 257 (1947)); *Cummings v. Walsh Const. Co.,* 561 F.Supp. 872, 879 (S.D.Ga.1983) ("Liability [under the doctrine of respondeat superior] may still attach even though the act is expressly forbidden by the employer."); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, 122 (1986), *rev. denied,* 317 N.C. 334, 346 S.E.2d 140 (1986). *Cf.* Annotation, *Liability of Employer, Other than Carrier, for a Personal Assault Upon Customer, Patron, or Other Invitee,* 34 A.L.R.2d 372, 396 (1954) ("[T]he overwhelming weight of authority supports the proposition ... that an employer may be held responsible in tort under the doctrine of respondeat superior for an assault committed by his employee while acting within the scope of the employment, even though the latter acted wantonly, and contrary to the employer's instructions.").

with Brooks required that Brooks carefully or safely transport Huddleston to Nucla aboard a single engine plane. Rather, if the negligence of Brooks occurred while Brooks was acting within the scope of the work for which he was hired, and if the negligence was not collateral to that work, then, if it was recognizable to UREA that the work as performed would be inherently dangerous, even if the negligence of Brooks violated his contractual obligations and UREA's express instructions, UREA would still be liable under the inherently dangerous activity exception for injuries directly and proximately caused to third persons by such negligence.[14] If this were not the rule, an employer could always avoid liability under the inherently dangerous activity exception simply by inserting into its agreements standard language to the effect that its independent contractor promises to perform safely and to take all necessary precautions. Consequently, when determining whether the work that an independent contractor was hired to perform was inherently dangerous, the trier of fact must take into account more than just the manner in which an oral or written contract legally obligates the contractor to perform such work. The important point is that while an independent contractor may have a legal obligation to take a particular precaution as a matter of contract law, *as a matter of fact* the employer may nevertheless know or contemplate, or may nevertheless have reason to know or to contemplate, that the work to be performed is inherently dangerous. The court of appeals erred, therefore, insofar as it defined the activity in question only or primarily according to the terms of Brooks' contractual obligations, rather than in terms of what, as a matter of fact, UREA knew or had reason to know about the type of dangers associated with the work it was hiring

Brooks to perform. *Cf. Ballinger v. Gascosage Elec. Coop.*, 788 S.W.2d 506, 511 (Mo.1990) (explaining that under the inherently dangerous activity exception, the employer "remains liable for the torts of the contractor[ ] simply for commissioning the activity. The liability attaches without any need for showing that the employer is in any respect negligent. It is purely vicarious.") (overruled by *Zueck v. Oppenheimer Gateway Properties*, 809 S.W.2d 384, 390 (Mo.1991), but only to the extent that *Ballinger* also holds that the inherently dangerous activity exception applies to employees of independent contractors covered by workers' compensation).

## IV

Having determined that the court of appeals erred in its definition of inherently dangerous activity, and that it also erred by applying that definition to an activity defined only or primarily according to an interpretation of Brooks' contractual obligations, we now address whether the plaintiffs produced sufficient evidence at trial to create an issue of fact for the jury as to whether all the elements of the inherently dangerous activity exception were proven by a preponderance of the evidence.

█ We acknowledge that the determination of whether an activity is inherently dangerous will ultimately depend on the state of the evidence bearing on that issue. Depending on the state of the evidence, a court may or may not be required to rule as a matter of law that the activity does or does not qualify as inherently dangerous. *See generally Kopeikin v. Merchants Mortgage and Trust Corp*, 679 P.2d 599, 601 (Colo.1984); *Gossard v. Watson*, 122 Colo. 271, 275, 221 P.2d 353, 356 (1950). If the state of the evidence is such that when viewed in a light most favorable to the

---

**14.** *Cf. Restatement (Second) of Torts* § 416 cmt. c ("[§ 416] deals with the liability of one who employs an independent contractor to do such work [i.e., work that creates a peculiar danger to others unless special precautions are taken], even though he stipulates in his contract or in a contract with another independent contractor that the precautions shall be taken," and "the fact that the contract contains express stipula-

tions for the taking of adequate precautions and that the contractor agrees to assume all liability for harm caused by his failure to do so, does not relieve his employer from the liability stated in this section."); *id.* § 416 cmt. a (explaining that there is a "close relation" between the rules stated in §§ 416 and 427, and that they "represent different forms of statement of the same general rule").

plaintiff, the court is convinced that a jury could not find that all the following elements have been proven by a preponderance of the evidence, then it should direct a verdict against the plaintiff and in favor of the employer: (1) that the activity in question presented a special or peculiar danger to others inherent in the nature of the activity or the particular circumstances under which the activity was to be performed; (2) that the danger was different in kind from the ordinary risks that commonly confront persons in the community; (3) that the employer knew or should have known that the special danger was inherent in the nature of the activity or in the particular circumstances under which the activity was to be performed; and (4) that the injury to the plaintiff was not the result of the collateral negligence of the defendant's independent contractor. Of course, if a jury could reasonably find from the evidence, when viewed in the light most favorable to the plaintiff, that all of the above elements have been proven by a preponderance of the evidence, then the issue of whether the activity is inherently dangerous should be submitted to the jury.

At trial, the plaintiffs' expert witness on aviation testified that in light of the particular circumstances surrounding the flight in question, it was his opinion that the flight was "very dangerous" if it was not carefully carried out. The jury also heard evidence to the effect that Brooks was hired to fly a single engine airplane, that such an airplane was unpressurized and uncertified for flights into icy conditions, that flying in the Colorado mountains safely in the wintertime requires a skilled understanding of sometimes difficult and unpredictable weather patterns, that the airport at Nucla did not have a Federal Aviation Administration approved instrument approach procedure, that Brooks filed an instrument flight plan, and that representatives of UREA took into consideration the risk involved in flying a small plane in the wintertime in the mountains of Colorado. The jury also heard evidence to the effect that the type of aircraft flown by Brooks is a good, reliable "work horse type airplane" capable of safely flying in Colorado all year around under proper conditions. There was no evidence introduced that, in general, Brooks was not a capable pilot.

We are satisfied that contracting with a charter airplane service to fly passengers in the wintertime is not per se an inherently dangerous activity. However, when the evidence bearing on the particular circumstances under which the flight was to be performed in this case is viewed in a light most favorable to the plaintiff, we are also convinced that the evidence created an issue of fact for the jury as to whether all the elements of the "inherently dangerous activity" exception to the general rule of nonliability for the negligence of an independent contractor were proven by a preponderance of the evidence.

V

Our last step is to consider whether the jury was properly instructed on the meaning of "inherently dangerous activity," and on how to apply that concept in this case. We conclude that it was not.

Understandably, the trial court relied heavily on the precise language employed in *Western Stock* (part of which we characterize today as "somewhat paradoxical") and was reluctant even to attempt to dissect into its individual elements the meaning of section 427 of the *Restatement (Second) of Torts.* As a result the jury was not instructed to consider separately any of the elements of the inherently dangerous activity exception that we identify today, and the jury was given no instruction at all on the issue of whether the accident was caused by the collateral negligence of Brooks. The jury instructions in this case were therefore " 'so erroneous or so confusing or misleading as probably to lead the jury into error of such proportion as to require a new trial.' " *Rego Co. v. McKown-Katy,* 801 P.2d 536, 539 (Colo. 1990) (quoting *Coleman v. United Fire and Casualty Co.,* 767 P.2d 761, 764 (Colo. App.1988)).[15]

**15.** We also note that Jury Instruction No. 20

and Special Verdict Form A instructed the jury

## VI

For the foregoing reasons, we reverse the judgment of the court of appeals and remand to that court with directions to order a new trial.

ROVIRA, C.J., dissents and VOLLACK, J., joins in the dissent.

Chief Justice ROVIRA dissenting:

Contrary to the majority, it is my opinion that rather than refining the circumstances and manner in which the inherently dangerous exception is to apply, we should take this opportunity to repudiate that doctrine and overrule the prior decisions of this court adopting it. I would do so for a number of reasons. First, I am of the opinion that, to the extent the policy considerations that gave rise to this exception are justifiable, they are neither adequately nor properly advanced by invocation of the inherently dangerous exception. Second, though the exception may appear desirable in the abstract, when its practical implications and potential applications are considered, it is revealed to be impractical. Third, the costs that are imposed as a result of this exception far outweigh any incremental benefits that are to be gained by adherence to it. Finally, it is my view that the inherently dangerous exception is itself unnecessary, as clearer more predictable theories of liability are available to address the policy considerations that purportedly support the inherently dangerous doctrine. Therefore, I respectfully dissent.

## I

The majority opinion refines the rule adopted by this court in *Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978), and *Garden of the Gods Village v. Hellman*, 133 Colo. 286,

294 P.2d 597 (1956), which recognized an exception to the general rule that an employer of an independent contractor is not liable for torts committed by the independent contractor. That exception provides that liability may be imposed on the employer based on the theory of vicarious liability so long as the torts occur while the independent contractor is engaged in an "inherently dangerous" activity on behalf of the employer. As refined by the majority, an "inherently dangerous" activity is one that

> presents a special or peculiar danger to others that is inherent in the nature of the activity or the particular circumstances under which the activity is to be performed, that is different in kind from the ordinary risks that commonly confront persons in the community, and that the employer knows or should know is inherent in the nature of the activity or in the particular circumstances under which the activity is to be performed.

Maj. op. at 290.

The majority finds that this rule of vicarious liability is justified on the bases of two primary policy considerations. One such consideration is the propriety of establishing "another layer of concern in order to try to ensure that activity that is inherently dangerous gets enough attention so that we reduce the number of people who are injured." Maj. op. at 287. The other policy rationale is

> that employers whose enterprises directly benefit from the performance of activities that create special and uncommon dangers to others should bear some of the responsibility for injuries to others that occur as a result of the performance of such activities.

Maj. op. at 287. Although I acknowledge that these goals are desirable, I do not

---

to answer the following question: "Was the flight pilot Brooks was hired by defendant Union Rural Electric Association to perform inherently dangerous *if not carefully carried out?*" (emphasis added). This way of formulating the issue for the jury is itself seriously misleading because the task for the jury was not to decide whether, if Brooks was careless, the flight was inherently dangerous; rather, the jury was to decide whether the flight Brooks was hired to

perform was inherently dangerous in light of the factual possibility that Brooks might or might not be careless. It is evident that carelessly flying a plane is more dangerous than flying a plane, and as a result of Instruction No. 20 and Special Verdict Form A, there is a significant chance that the jury was led to consider the "special danger" of work that Brooks was *not* hired to perform, specifically, the work of carelessly flying Huddleston to Nucla.

agree that the inherently dangerous exception to the general rule advances them.

It is axiomatic that reducing the number of injuries which result from the performance of inherently dangerous activities is a desirable end. Indeed, this policy is merely one way to express one of the primary functions of tort law, *i.e.*, creating the incentive to prevent the occurrence of harm. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 4, at 25 (5th ed. 1984). Simply identifying this policy, however, begs the question whether, and at what cost, a particular rule of tort law may further this end.

The inherently dangerous exception to the general rule of nonliability does not necessarily insure that inherently dangerous activities will be performed any more safely than in the absence of this exception. This is so for at least three reasons. First, because the inherently dangerous exception creates no new obligations or duties on the part of the employer than would otherwise be applicable, it does not directly create the incentive on the part of the employer to more carefully select, instruct, or provide for the independent contractor. Second, because independent contractors—by definition—discharge their activities free from the control and supervision of their employer, there is no reason to assume that the imposition of vicarious liability on the employer will, or could, have a significant impact on the safety with which an independent contractor performs the inherently dangerous activity. *See Restatement (Second) of Agency* § 2(3) (1958) ("An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."). Consequently, any additional safety incentives that may be created by imposition of the inherently dangerous exception could, by the very nature of the employer/independent contractor relationship, be only minimal. Finally, given that the inherently dangerous exception imposes liability on the employer, and not the independent contractor, it cannot be said that the rule

creates any additional incentives on the independent contractor to perform the work any more safely than otherwise would be the case. In light of these observations, I am left with considerable doubt as to whether the inherently dangerous exception can be said to further the first policy rationale that purportedly justifies it, *i.e.*, the avoidance of harm.

II

The propriety of abolishing the exception is similarly warranted on the grounds that the rule itself creates extremely impractical expectations on potential employers of independent contractors. The second policy justification thought to support the inherently dangerous exception identified by the majority is

> that employers whose enterprises directly benefit from the performance of activities that create special and uncommon dangers to others should bear some of the responsibility for injuries to others that occur as a result of the performance of such activities.

Maj. op. at 287. While such a principle may seem perfectly logical, its impracticalities can clearly be seen by recognizing the wide range of circumstances to which the inherently dangerous exception applies.

It is important to note that "employers whose enterprises directly benefit" from inherently dangerous activities include not only large corporations, multi-million dollar manufacturers, and general contractors harnessing the expertise of many independent contractors. The "enterprises" which may benefit from the performance of inherently dangerous work can be as commonplace as a homeowner contracting to have his or her home painted. *See Rohlfs v. Weil*, 271 N.Y. 444, 3 N.E.2d 588 (1936) (affirming appellate court's finding that a jury could properly impose vicarious liability on an employer who contracted with an independent contractor for painting services when a pedestrian passing near a scaffold used to complete the painting was injured by falling objects from the scaffold); *Mackey v. Campell Constr. Co.*, 101

Cal.App.3d 774, 162 Cal.Rptr. 64 (1980) (affirming the imposition of vicarious liability on an employer for injuries sustained by an independent contractor's servant who was injured when he fell from a scaffold while attempting to move it). In such a circumstance, it seems highly impractical to impose liability on a homeowner for the negligence of an independent contractor when the very reason for hiring the contractor may be the acknowledged *lack* of expertise, knowledge, and experience required to correctly perform the inherently dangerous activity. To what extent can it reasonably be expected that such activities will be undertaken more safely as a result of imposing liability on a party who may very well be completely ignorant with respect to the proper way to perform the task and wholly unknowing respecting possible safety measures that might be taken? Moreover, even if one accepts the notion that innocent persons injured as a result of inherently dangerous activities should not go uncompensated, to what extent does it make sense to impose the burden of compensation on the homeowner contracting for painting services?

## III

Such doubts should, in and of themselves, create considerable apprehension regarding the desirability of maintaining this rule. This skepticism is enhanced, however, after recognition is given to the fact that any minimal safety gains that may result from invocation of this rule are far outweighed by the significant uncertainties and costs imposed by the exception.

As we recognized in *Western Stock Center, Inc.,* the question of what constitutes an inherently dangerous activity is a difficult one. *Western Stock Center, Inc.,* 195 Colo. at 378, 578 P.2d at 1050. The inconsistencies and ambiguities that have resulted from the adoption of the inherently dangerous rule have led to a line of cases that is, as one commentator has noted, "divided against itself without reason." James B. McHugh, Note, *Risk Administration in the Marketplace: A Reappraisal of the*

*Independent Contractor Rule,* 40 U.Chi. L.Rev. 661, 665 (1973).

For example, "fumigating is regarded as inherently dangerous ... while disinfecting railroad cars with a creosote solution is not. Similarly, steam sawmills have been held both to be and not to be inherently dangerous, while negligently piled beams have revealed an insidious character unknown to negligently piled pipes." *Id.* at 665 (footnotes omitted). In addition, constructing a dam has been held to be inherently dangerous whereas the construction of a bridge is not. *Id.* 665 n. 26. The removal of a decayed structure has been found to be inherently dangerous, but not raising the roof of a building. *Id.* Further, there is little reason to suppose that such contradictory results will be avoided simply by invocation of the majority's refined rule—different juries will always be free to apply the inherently dangerous test differently.

Given the seeming contradictions evidenced by these cases regarding what is or is not an inherently dangerous activity, it is safe to assume that this exception often will provide no warning to prospective employers of independent contractors respecting their potential liabilities. Again, this fact tends to repudiate the notion that the inherently dangerous exception would enhance the safety with which inherently dangerous activities are undertaken.

Further, any minimal benefits provided by the exception are outweighed by the significant costs that it imposes on employers and consumers alike. There can be little doubt that independent contractors who engage in inherently dangerous activities should be insured for any injuries that might result from their activities. Naturally, the cost of such insurance will be passed on to those who employ these contractors. This increased cost carried by the employer will in turn be passed on to his or her consumers. With the inherently dangerous exception, however, the law now imposes upon prudent employers the obligation to insure against the potential negligence of their independent contractors. As stated above, however, responsible independent contractors should also insure against their

negligence. The result is that all independent contractors who engage in inherently dangerous activities will now be "double insured"—resulting in increased and unnecessary costs both to the employer of independent contractors and to the ultimate consumer. Moreover, because of the confusion regarding what an inherently dangerous activity might be, it would be reasonable to assume not only that many independent contractors will be double insured, but that many employers will be obtaining insurance for the activities of their independent contractors when such insurance may in fact be unnecessary. Once again, any minimal safety benefits that may result from the inherently dangerous exception will be outweighed both by the uncertainties and costs imposed by the exception.

## IV

It could be argued, of course, that the costs, uncertainties, and impractical expectations which attend the inherently dangerous rule adequately could be avoided by properly restricting the scope of the inherently dangerous exception. This is, in fact, precisely what the majority opinion purports to do. The majority, after articulating the proper test to apply in determining what activities are inherently dangerous, seeks to restrict the overly broad test set forth in *Western Stock Center* which failed to "adequately identify the legal criteria by which to determine whether an activity may properly be characterized as 'inherently dangerous'...." Maj. op. at 288. Examination of the majority opinion, however, reveals the intrinsic difficulty in attempting to restrict the coverage of the rule and thereby avoid the problems identified above. This can most clearly be seen simply by looking to the facts of the case before us. It is certainly possible that in the present case, a jury applying the inher-

ently dangerous exception could find that a special or peculiar danger was presented by flying a single-engine plane in a mountainous area during poor weather and thus, hold UREA liable for pilot Brook's negligence. This alone reinforces my views regarding the propriety—or lack thereof—in maintaining this rule. I am bothered even more, however, after consideration is given to the fact that in this case, the court of appeals noted that "[s]tatistics show that air transportation is far safer than automobile transportation." *Huddleston v. Union Rural Elec. Ass'n,* 821 P.2d 862, 866 (Colo.App.1992). Thus, it would be entirely safe to assume that a jury could also find that hiring a taxicab or bus service to transport people through the mountains is an inherently dangerous activity. If such a finding is indeed possible, I think that such a fact speaks for itself regarding the majority's success in its effort to "supply the appropriate analytical framework for answering" the question of what an inherently dangerous activity is. Maj. op. at 288.

## V

Though I acknowledge the desirability of achieving the policy considerations which are thought to support the inherently dangerous exception, I would nevertheless abolish the inherently dangerous exception not only for the reasons stated above, but also based on my view that the exception is wholly unnecessary to attain those policies. In its stead, I would favor application of the principles developed in the area of negligent hiring.[1] Doing so would more appropriately create the incentives on the part of independent contractors to properly perform their activities safely, because good safety records could more reasonably be expected to translate into the confidence required to hire independent contractors.

---

1. *Restatement (Second) of Agency* § 213 (1958) provides:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

(a) in giving improper or ambiguous orders of [sic] in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon promises or with instrumentalities under his control.

In addition, such a rule would squarely place the obligation on employers to ensure that the independent contractors whom they hire are adequately qualified and sufficiently responsible to properly discharge their duties.

Therefore, I dissent.

I am authorized to say that Justice VOLLACK joins in this dissent.